**Keith S. BETTS, and Oskar B. McMillian, Plaintiffs,**

v.

**Gary R. McCAUGHTRY, Lynn L. Oestreich, Anna M. Secchi, and Captain Fuller, Defendants.**

No. 92–C–640–C.

United States District Court, W.D. Wisconsin.

July 21, 1993.

Keith Betts, pro se.

Oscar B. McMillian, pro se.

Stephen J. Nicks, Asst. Atty. Gen., Madison, WI, for Gary R. McCaughtry, Lynn L. Oestreich, Anna M. Secchi, and Captain Fuller.

## OPINION AND ORDER

CRABB, Chief Judge.

Plaintiffs are African–American inmates at the Waupun Correctional Institution. They brought this civil action under 42 U.S.C. § 1983 contending that defendants violated their First Amendment rights and right to equal protection under the Fourteenth Amendment by censoring musical cassettes bearing "Parental Advisory" labels and by banning certain hair products and the wearing of carved hair styles, long fingernails and sunglasses and stocking caps indoors. Plaintiffs contend that the defendants' policies discriminate both by race and sex: by race, because the policies affect African–Americans disproportionately and by sex, because the grooming policies are applied differently to male and female inmates. Plaintiffs contend also that the policies infringe on their First Amendment rights by denying them the right to express themselves. Plaintiffs maintain that the policies deprive them arbitrarily of liberty interests in violation of the due process clause. Finally, plaintiff Betts contends that he was retaliated against for challenging the Waupun censorship policy.

Defendants have moved for summary judgment, asserting that their policies do not discriminate on the basis of race or gender. Defendants contend further that the suit should be dismissed under the doctrine of qualified immunity.

I find that plaintiffs have failed to come forward with evidence that male and female inmates are treated unequally for purposes of their gender discrimination claims and that plaintiffs have failed to offer sufficient evidence to prove that the challenged regulations constitute racial discrimination. In addition, I find that the challenged regulations are related rationally to a legitimate security concern. Therefore plaintiffs' First Amendment and due process claims fail. Defendants will be awarded summary judgment on plaintiff's First Amendment, due process and equal protection claims. Finally, plaintiffs have failed to submit any evidence to support plaintiff Betts' claim of retaliation.

To succeed on a motion for summary judgment, the moving party must show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Indiana Grocery, Inc. v. Super Valu Stores, Inc.,* 864 F.2d 1409, 1412 (7th Cir.1989). When the moving party succeeds in showing the absence of a genuine issue as to any material fact, the opposing party must set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991). The opposing party cannot rest on the pleadings alone, but must designate specific facts in affidavits, depositions, answers to interrogatories or admissions that establish that there is a genuine issue for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. Also, if a party fails to make a showing sufficient to establish the existence of an essential element on which that party will bear the burden of proof at trial, summary judgment for the opposing party is proper. *Id.* at 322, 106 S.Ct. at 2552.

For the purpose of this motion only, I find from the parties' proposed findings of fact that the following material facts are not in dispute.

## FACTS

Plaintiffs are African–American inmates who were incarcerated at the Waupun Correctional Institution at all times relevant to this action. During this time, defendant McCaughtry was warden of Waupun, defendant Oestreich was associate warden in charge of security, defendant Secchi was associate warden in charge of treatment, and defendant Fuller was a captain employed as property department supervisor and investigative lieutenant/security supervisor.

As of December 21, 1992, approximately 927 of the 1150 inmates at Waupun were incarcerated for assaultive offenses. Between January 1, 1992 and November 19, 1992, Waupun issued 163 conduct reports for battery, 224 conduct reports for threats, 22 conduct reports for inciting a riot, 36 conduct

reports for participating in a riot, 44 conduct reports for weapons possession. At Waupun, numerous inmates are associated with gangs.[1] Inmates at Waupun were issued 43 conduct reports for group resistance and petitions in the above time period.

Inmates at Waupun cannot possess curling irons, pressing combs and hair dryers because such hot metallic items could be used as weapons by inmates, but female inmates at Taycheedah are allowed to have such items. The item most commonly used as a weapon by inmates at Waupun is a padlock that is supplied to inmates by the prison administration.

The Waupun canteen has the following hair care items available: curlers, permanent kits, ponytail holders, scissors, hair conditioners, shampoos and grooming gels. Prison officials allow inmates to wear hair care caps and curlers to and from the recreation area and in the housing units. An inmate is allowed up to 50 hair curlers.

Permanent kits are used almost exclusively by African–American inmates. Inmates with hair curlers are not permitted to leave their cells to eat, forcing an inmate to choose between eating or exercising his grooming preferences.

Waupun is an old institution with some housing units over 75 years old. The electricity demands of hair dryers and curling irons are quite high. The increased electrical load would constitute a fire hazard. There are only two outlets per inmate, and these outlets must accommodate radios, televisions, typewriters and fans.

The rule banning indoor wearing of caps and sunglasses is designed to facilitate identification of inmates who participate in disturbances. On May 23, 1992, in the presence of 400 inmates in the cafeteria, twenty-eight inmates were involved in the assault and injury of seven officers. Even though much of the action was videotaped, it was difficult to identify the inmates involved who wore sunglasses and hats that they pulled down to conceal their identities.

Although carved hair styles are worn primarily by black inmates out of recognition of their African heritage, white inmates have engaged in hair carving as well as in putting multiple parts in their hair. The Waupun grooming code and Wis.Admin.Code § DOC 309.338(3)(b) have been enforced against whites as well as blacks. The prohibition of carved designs and multiple parts is intended to limit gang-related identification in prison. Given the number of inmates suspected of gang affiliation, it is crucial to institution security and order to limit outward expression of these affiliations. Gang-affiliated signals change over time so it is impossible to prohibit certain types of signals without missing others.

There is a wide variety of acceptable hairstyles at Waupun. Inmates wear long Afros, short Afros, greased down hairdos, tightly curled hairdos, ponytails, single tails, tall flat tops and short flat tops, dreadlocks, braids and shaved heads.

The Waupun grooming code prohibits inmates from growing their fingernails beyond the tips of their fingers because of the assaultive nature of the inmate population. Fingernails longer than the tip of the fingers could easily be cut or filed into extremely sharp points that would present a physical danger to correctional staff and other inmates when altercations occur. Female inmates at Taycheedah Correctional Institution are permitted to grow their fingernails long and the canteen at Taycheedah is stocked with nail growth products.[2]

---

1. Defendants submit the affidavit of defendant Oestreich, security director at Waupun, indicating comparable rates of violence at Taycheedah. Because defendants have not established the basis of defendant Oestreich's personal knowledge concerning Taycheedah, I will ignore these proposed facts. Fed.R.Civ.P. 56(e) requires that supporting affidavits be made on the basis of personal knowledge and "shall show affirmatively that the affiant is competent to testify to the matters stated therein."

2. Plaintiffs allege that they wish to grow their fingernails long to express an African belief in "Sangoma" (One Who is Blessed with the Spirits of his Ancestors). However, they offer no evidence of the existence of this ritual or of the underlying belief, let alone whether the practice is religious or secular in nature.

Waupun officials require inmates to submit for review any cassette tape mailed to an inmate that is marked "Parental Advisory, Explicit Lyrics," regardless of the artist or musical style. (This parental advisory warning label is affixed by the record company.). When such a tape is received at Waupun from a retail establishment, officials send a memo to the inmate to whom it is addressed giving the inmate the choice of having the tape reviewed or returned. Almost all inmates choose to have the tape reviewed. Officials will deny receipt of a tape if it is found to incite or encourage violence, but not if it is merely sexually or racially graphic.

Defendants posted bulletin board notices indicating which tapes subject to review had been approved or disapproved. The notice posted June 15, 1992, contained a list of 32 approved tapes and 11 disapproved tapes. All the tapes on both lists are black rap music, with the exception of the record "Use Your Illusion" by Guns and Roses, which appears on the approved list. A notice posted September 30, 1992, contains revised lists of 46 allowed cassettes and 18 disallowed cassettes that are similarly skewed in their focus on black rap music.

The January 1, 1993 bulletin board notice regarding cassette tape review excludes the tape by ICE–T ("Original Gangster"). The basis for the exclusion is that the song "The Tower" promotes violence. Inmates are allowed to receive a cassette by 2 LIVE CREW ("As Nasty as They Wanna Be, Part II"), as well as a tape by a white artist: CHRIST ON A CRUTCH ("Crime Pays When Pigs Die"), which contains lyrics such as those found in "Paranoid World Vision" or "Fish People."

Inmates are permitted to view movies such as "The Glass House: Riot"; "Education of Sonny Carlson"; "Birdman of Alcatraz"; "San Quentin"; "Women of San Quentin"; "The Jericho Mile"; "Six Against the Rock", "Lock–Up"; "Bad–Boys" and "Brubaker." Inmates are permitted to read books such as *White Man's Justice, Black Man's Grief, Blood on My Eye, Soledad Brothers, Belly of the Beast* and *If Tomorrow Comes.*

Plaintiff Betts was not allowed to have his 2nd II NONE tape after it was returned by the post office on June 18, 1992. Even though this tape title was on the approved list as of June 15, 1992, it was disallowed under a longstanding policy of Waupun because it had not come directly from an authorized retail outlet but had been sent back after plaintiff Betts had sent it to his brother, Garnett Betts. The tape was excluded because potential tampering could have introduced contraband into Waupun.

## OPINION

### A. Equal Protection Claims

#### 1. Race discrimination

Plaintiffs' claim of race discrimination rests on their contentions that the practice of screening all cassettes labelled with parental advisory labels is a pretext for censoring rap music, that the burden of censorship falls disproportionately on African–American inmates and that prison regulations prohibiting inmates from carving designs in their hair, wearing sunglasses and stocking caps, and growing their fingernails long were designed to discriminate against African–American inmates. Racial discrimination in the administration of prisons violates the equal protection clause, unless it is justified by a compelling state interest. *Black v. Lane,* 824 F.2d 561, 562 (7th Cir. 1987). But mere assertions of such discrimination do not suffice to show that a particular regulation is discriminatory even though it is facially neutral. Plaintiffs must show that under the regulation black inmates are treated differently from similarly situated white inmates and that defendants imposed the regulation with a discriminatory purpose or intent. *Minority Policy Officers Ass'n v. City of South Bend,* 801 F.2d 964, 966 (7th Cir.1986). To prove discriminatory intent, plaintiffs must do more than show that a regulation has a disproportionate impact on a particular group. *Village of Arlington Heights v. Metro. Housing Dev. Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). The Supreme Court has noted that the disproportionate impact of a regulation is an important starting point and provides some evidence of discriminatory intent. *Village of Arlington Heights,* 429 U.S. at 266, 97 S.Ct.

at 563–564. In rare circumstances evidence of disproportionate impact can be determinative, if the regulation affects a discrete group exclusively and the pertinent aspects of the regulation lack a plausible justification. *Id.* (citing to *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886)). Absent these circumstances, a plaintiff must prove discrimination by evidence of the historical background and the sequence of events leading to the state action and not simply by evidence of a disparate impact. *Village of Arlington Heights,* 429 U.S. at 267–268, 97 S.Ct. at 564–565.

■ Because plaintiffs' allegations of racial discrimination depend solely on evidence of discriminatory impact and plaintiffs have failed to adduce such evidence, their claims must fail. The fact that nearly all of the cassettes subject to censorship are African–American rap music presents some evidence of a discriminatory motive. Arguably, at some point defendants became aware that this means of censorship affected a musical genre associated with African–American inmates almost exclusively. However, it is questionable whether the censorship of African–American rap music can be equated with discrimination against African–American inmates. Plaintiffs have failed to show that the audience for this music is exclusively black. In any event, the Supreme Court has stated that an intent to discriminate constitutes more than an awareness of inevitable consequences. *See Personnel Admin'r of Mass. v. Feeney,* 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979) (upholding veterans preferences despite obvious disproportionate impact on women). In this case, plaintiffs provide no direct evidence that defendants' purpose was to discriminate against African–American inmates or any historical evidence to this effect. The evidence of disproportionate impact is insufficient to establish discriminatory purpose.

Because a plausible, legitimate purpose exists for the regulation—to prevent materials that present a risk of violence—and because the extent of the discriminatory impact is questionable, this is not the kind of case in which the evidence of impact alone is suffi-cient to establish discrimination. *Cf. Yick Wo,* 118 U.S. 356, 6 S.Ct. 1064.

■ Similarly, in arguing that the grooming regulations are racially motivated, plaintiffs rely entirely on the purported discriminatory impact of neutral regulations prohibiting inmates from carving designs in their hair, wearing sunglasses indoors, wearing their fingernails long, wearing stocking caps or using certain grooming devices. Although plaintiffs characterize the grooming, hairstyle and fingernail practices as expressions of African–American heritage, they have not produced evidence to support a finding that they are exclusively so or any evidence to suggest that defendants adopted these regulations with the purpose of discriminating against African–American inmates. Because plaintiffs have failed to provide evidence of discriminatory purpose sufficient to establish the existence of this essential element of their case, summary judgment will be awarded in favor of defendants on plaintiffs' claims of racial discrimination.

### 2. *Gender discrimination*

■ In contrast to plaintiffs' claims of racial discrimination, plaintiffs' allegations that male inmates at Waupun are treated differently from female inmates at Taycheedah present a challenge to regulations that discriminate overtly on the basis of gender.

The equal protection clause of the Fourteenth Amendment guarantees that "all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Center,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). To be "similarly situated," groups need not be identical in makeup, they need only share commonalities that merit similar treatment. However, the equal protection clause does not prevent different treatment of men and women when their situations are different in fact. *Michael M. v. Superior Court of Sonoma County,* 450 U.S. 464, 101 S.Ct. 1200, 67 L.Ed.2d 437 (1981). The Fourteenth Amendment does not deny states the power to treat different classes of persons differently. *Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971).

In considering prisoner claims based on gender discrimination, courts have not required *identical* treatment of female and male prisoners. Instead, courts have required that male and female prisoners be treated "in parity" unless there is a sufficient reason to treat them differently. *McCoy v. Nevada Dep't of Prisons,* 776 F.Supp. 521, 523 (D.Nev.1991) (educational, vocational and recreational privileges); *Dawson v. Kendrick,* 527 F.Supp. 1252 (S.D.W.Va.1981); *Bukhari v. Hutto,* 487 F.Supp. 1162 (E.D.Va. 1980); *Glover v. Johnson,* 478 F.Supp. 1075, 1079 (E.D.Mich.1979) (educational and rehabilitation opportunities). Parity means that states are bound to provide male and female inmates "with treatment and facilities that are substantially equivalent ... i.e., equivalent in substance if not in form—unless [the states'] actions, though failing to do so, nonetheless bear a fair and substantial relationship to achievement of the State's correctional objectives." *Glover v. Johnson,* 478 F.Supp. at 1079. Classifications informed by outmoded stereotypes of gender differences violate the equal protection clause. *See Mississippi Univ. for Women v. Hogan,* 458 U.S. 718, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982); *Frontiero v. Richardson,* 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973).

Plaintiffs are denied the privileges accorded female inmates at Taycheedah to grow their fingernails long and retain certain personal property with which to groom their hair and fingernails, in particular, emery boards and curling irons. However, male inmates at Waupun are permitted a wide variety of grooming accessories, including curlers, permanent kits, ponytail holders, scissors, hair conditioners, shampoos and gels. I conclude that the grooming privileges at Taycheedah and Waupun are in parity and that the minor differences that exist are not of constitutional significance. Therefore, summary judgment will be awarded in favor of defendants.

### B. *First Amendment Claims*

#### 1. *Rap music*

■ It is undisputed that rap music constitutes speech protected by the First Amendment. *See, e.g., Luke Records, Inc. v. Navarro,* 960 F.2d 134, 137 (11th Cir.1992) (the record "As Nasty as They Wanna Be" contains oral conventions specific to African–American culture and expresses both politically and culturally significant ideas). Considerable deference is due prison officials in adopting policies that serve security interests. Courts will "not substitute our judgment for [prison officials'] 'in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations.' " *Caldwell v. Miller,* 790 F.2d 589 (7th Cir.1986) (quoting *Pell v. Procunier,* 417 U.S. 817, 827, 94 S.Ct. 2800, 2806, 41 L.Ed.2d 495 (1974)). An infringement on an inmate's First Amendment rights is permissible if it is "reasonably related to legitimate penological interests." *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282 (1987) (quoting *Turner v. Safley,* 482 U.S. 78, 81, 107 S.Ct. 2254, 2257–58, 96 L.Ed.2d 64 (1987)). To determine whether a prison practice is reasonable, courts must ask: (1) whether a valid, rational connection exists between the regulation and a legitimate governmental interest; (2) whether there are alternative means of exercising the right in question available to the prisoner; (3) the impact that accommodation of the right would have on prison guards and other inmates and on the allocation of prison resources; and (4) the existence of obvious, easy alternatives. *Williams v. Lane,* 851 F.2d at 877; *Thornburgh v. Abbott,* 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989).

In applying this test, the Court of Appeals for the Seventh Circuit has noted "[i]t is critically important ... that the record reveal the manner in which security considerations are implicated by the prohibited activity." *Caldwell,* 790 F.2d at 597. Although *Caldwell* was decided prior to *O'Lone* and *Turner,* the Court of Appeals for the Seventh Circuit has noted that these cases "have served to clarify and amplify, rather than depart from, the *Caldwell* standard." *Williams v. Lane,* 851 F.2d 867, 877 n. 6 (7th Cir.1988) (quoting *Hadi v. Horn,* 830 F.2d 779, 784 n. 6 (7th Cir.1987)). The state can show how security concerns are implicated by submitting an affidavit of a person responsible for making discretionary decisions

related to security matters indicating that the regulated conduct "constitute a threat of potential violence or [is] disruptive of institutional security." *Id.* at 599.

■ According to defendant Oestreich's affidavit, the prison forbids only those tapes that advocate or encourage violence and permit all other tapes without regard to their offensiveness. This affidavit also indicates the assaultive nature of the Waupun prison population. Defendants argue that in light of prison security concerns the system for screening cassette tapes is reasonable under the *Turner* test.

The government's purpose in this case is legitimate. Prison security is "central to all other corrections goals." *Thornburgh,* 490 U.S. at 415, 109 S.Ct. at 1882 (citing *Pell v. Procunier,* 417 U.S. at 823, 94 S.Ct. at 2804). Moreover, the censorship appears to be rationally related to this purpose. It prohibits only music that the security director has determined to be a security threat because it advocates violence. In *Thornburgh,* 490 U.S. at 417, 109 S.Ct. at 1883 the Court commented on a similar form of censorship:

> it is rational for the Bureau to exclude materials that, although not necessarily "likely" to lead to violence, are determined by the warden to create an intolerable risk of disorder under the conditions of a particular prison at a particular time.

Plaintiffs submit no evidence that suggests that this censorship is an exaggerated response to prison concerns. Inmates retain the ability to engage in the speech rights in question. The majority of cassette tapes that are screened are permitted to inmates as are all cassettes that do not bear advisory labels. Nor have defendants banned a particular artist. Plaintiffs do not point to an alternative means of screening cassettes that would enable prison administrators to prohibit the influx of materials that touch on violence to an extent the administrators considers to be inflammatory. Although plaintiffs assert that inmates are permitted to

view movies and read books that convey messages allegedly similar to the banned cassettes, they fail to show that the content of these materials is comparable.[3] On the basis of this evidence, I conclude that the system of censorship imposed by defendants does not violate plaintiffs' First Amendment rights.

2. *Limitations on hair style, sunglasses, fingernail length and the wearing of caps as First Amendment violations*

Plaintiffs challenge to the grooming regulations raises First Amendment as well as equal protection issues. Plaintiffs argue that the long fingernails, carved hair designs, sunglasses and stocking caps manifest expressions of "black pride" and African–American cultural traditions.

■ At the outset, I note that some courts have been reluctant to recognize hair styles or clothing choices as sufficiently expressive to warrant the protection of the First Amendment. *See, e.g., Richards v. Thurston,* 424 F.2d 1281 (1st Cir.1970); *New Rider v. Board of Ed. of Ind. Sch. Dist. No. 1, Okl.* 480 F.2d 693 (10th Cir.), *cert. denied,* 414 U.S. 1097, 94 S.Ct. 733, 38 L.Ed.2d 556 (1973) (wearing of braids by Native American school children not sufficiently expressive); *but see* Justice Douglas's dissent in *New Rider,* 414 U.S. at 1099, 94 S.Ct. at 734 (braids express message of racial pride) and *Braxton v. Board of Public Instruction of Duval Co., Fla.,* 303 F.Supp. 958, 959 (M.D.Fla.1969) (goatee worn as an expression of racial pride enjoys protection of the First Amendment). I find this incomprehensible. In my view, those choices are the essence of personal expression that readily meet the two-part test articulated in *Spence v. Washington,* 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974), to determine the communicative value of conduct: (1) whether there is an intent to convey a particular message; and (2) whether the conduct was likely to be understood as communication by

---

**3.** In addition, plaintiffs point to a cassette allowed to inmates despite violent overtones. This cassette is not screened apparently because a parental advisory label was not imposed on it. For one, I cannot discern any graphic or explicit

advocacy of violence in the lyrics in question. More important, the mere fact that the method used by defendants is underinclusive is not fatal to its validity.

observers, given the surrounding circumstances. However, it not necessary to decide whether as a general rule personal appearance would meet this test. Defendants' reaction to plaintiffs' choices substantiates plaintiffs' claim of expressiveness, at least with respect to their desired hair styles. Defendants' opposition to them is based solely on their belief that the styles convey gang information.

Plaintiffs fail to articulate what message, if any, is intended by wearing sunglasses or caps indoors. In addition, although plaintiffs assert that the wearing of long fingernails expresses an African belief in "Sangoma," they have not explained this tradition or shown that it has any significance to any subsection of the African American community.

However, even assuming that all of plaintiffs' clothing and grooming choices are sufficiently expressive to constitute protected speech, plaintiffs' claims must fail. Defendants' concern that carved hair designs promote gang-related identification is a significant security-related concern. *See, e.g., Rios v. Lane,* 812 F.2d 1032, 1037 (7th Cir.1987) ("it is difficult to conceive of a single factor more detrimental to penological objectives than organized gang activity"). Although gang membership could be conveyed in a thousand different ways, and although defendants have not submitted detailed evidence of a gang problem at Waupun, deference is due the opinion of the security director of Waupun that a gang problem exists and that the carved hairstyles pose a risk of gang signifying. Defendants assert that there exist numerous known gang members at the prison and they refer to conduct reports that concern group resistance. Although this evidence is slim, it is sufficient to corroborate the security director's view that a gang problem exists. Defendants do not argue that certain designs are associated with gang membership. Instead, they assert that carved designs can be used for this purpose and that it would be difficult to monitor each hair cut to determine its gang-relatedness, which is why the regulation bans all types of carved hairstyles and double parts. Plaintiffs have offered no evidence that suggests

that a more limited prohibition would operate as effectively. On the basis of this evidence, I conclude that summary judgment is warranted in favor of the defendants.

With respect to wearing sunglasses and stocking caps indoors, defendants assert that this regulation prevents inmates from escaping identification in the event that they participate in a mass disturbance. This regulation appears reasonable to achieve such ends, as is the prohibition against long fingernails, which is intended to protect guards and other inmates from their use as weapons. Plaintiffs argue that inmates are permitted materials that are more useful as weapons. This may be true, but it does not preclude defendants from addressing discrete risks that are readily manageable. Plaintiffs fail to show that the disputed regulations represent an exaggerated response to legitimate security concerns or that the regulations could be drawn so as to be less obtrusive. Therefore, I will award summary judgment in favor of defendants on plaintiffs' First Amendment claims.

### C. Due Process

1. *Rules prohibiting carved hair styles, long fingernails, the wearing of sunglasses and stocking caps as due process violations*

 Plaintiffs' final argument is that they have a liberty interest in growing their fingernails, in carving designs into cropped hair, and in wearing sunglasses and stocking caps. They argue that the rules prohibiting such practices constitute arbitrary deprivations of their liberty interests in violation of the Fourteenth Amendment.

The Fourteenth Amendment prohibits a state from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. In *Kelley v. Johnson,* 425 U.S. 238, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976), the Supreme Court addressed the question whether police officers have a liberty interest in wearing their hair a certain length. The Court assumed for the purpose of the case that "the citizenry at large has some sort of liberty interest ... in matters of personal appearance," but held that with respect to law enforcement officers

the state need only show that the regulation is not rational or arbitrary in order that the regulation be sustained. *Id.* at 247–248, 96 S.Ct. at 1445–46; *see also Hill v. Estelle,* 537 F.2d 214, (5th Cir.1976) (applying rational basis test to prison hair regulations); *Rinehart v. Brewer,* 491 F.2d 705 (8th Cir.1974). Whether one applies the rational basis standard of *Kelley* or the somewhat more rigorous standard in *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 does not effect the outcome. As I have noted above, defendants have shown that the challenged regulations are related reasonably to legitimate security concerns. Therefore, defendants will be awarded summary judgment on plaintiffs' due process claims.

### D. *Retaliation*

■ The final claim in this case concerns plaintiff Betts's assertion that his cassette tape was withheld and rerouted from the institution in retaliation for his refusal to consent to screening and for his complaints about screening. Plaintiffs have failed to submit evidence of retaliation. They have not shown even a close sequence of events that might enable a trier of fact to infer retaliation. *Benson v. Cady,* 761 F.2d 335, 342 (7th Cir.1985). Accordingly, defendants will be granted summary judgment as to this claim as well.

### ORDER

IT IS ORDERED that defendants' motion for summary judgment is GRANTED with respect to all of plaintiffs' claims.

The Clerk of Court will enter judgment for defendants and close this case.