**ECLIPSE ENTERPRISES, INC., d/b/a Eclipse Comics; and Wantagh Distributors, Inc. d/b/a Collectors Comics, Plaintiffs,**

v.

**Thomas GULOTTA, Individually and in His Capacity as County Executive of the County of Nassau; Donald Kane, Individually and in His Capacity as Commissioner of the Nassau County Police Department; Joseph Mondello, Bruce Nyman, Donald DeRiggi, Benjamin Zwirn and Lewis Yevoli, Individually and in Their Capacity as Members of the Nassau County Board of Supervisors; and the County of Nassau, Defendants.**

No. CV 92–3416 (ADS).

United States District Court,
E.D. New York.

Sept. 26, 1996.

Lankenau Kovner & Kurz, L.L.P. by Robert Balin, New York City, for plaintiffs.

Kopff, Nardelli & Dopf by Peter S. Williams, New York City, for defendants.

SPATT, District Judge:

This lawsuit addresses the constitutionality of Nassau County Local Law No. 11–1992 ("Local Law 11–1992") which provides that selling trading cards to minors which depict a "heinous crime, an element of a heinous crime, or a heinous criminal and which is harmful to minors" is a Class A misdemeanor. According to the plaintiffs Eclipse Enterprises, Inc., doing business as Eclipse Comics, ("Eclipse"), and Wantagh Distributors, Inc., doing business as Collectors Comics ("Comics," collectively the "plaintiffs"), Local Law 11–1992 violates their free speech, due process and equal protection rights under the United States and New York State Constitutions. As a result, the plaintiffs seek declaratory and injunctive relief, monetary damages and attorneys' fees. The defendants contend that the Local Law 11–1992 is an appropriate exercise of the Nassau County Legislature's authority to protect the welfare of its children and as a result they are entitled to judgment in their favor.

*I. Background*

Eclipse manufactures series of trading cards, including, among others, a "True Crime" series which creates an encyclopedic history of infamous criminals and law enforcement officials. Other series include "Coup D'etat," which reviews the assassination of President John F. Kennedy. This series contains cards portraying President Kennedy, Lee Harvey Oswald and the actual shooting. The "Rotten to the Core" series addresses various crimes connected with New York City's municipal scandals. The "Drug Wars" series considers individuals and events related to the prohibition of drug trafficking.

The defendant Thomas Gulotta is the Nassau County Executive who presided over the Nassau County Board of Supervisors in 1992, which at the time, was the county legislature, and was responsible for enacting Local Law 11–1992. The Board of Supervisors has since been replaced with a new form of county legislature. The defendants Joseph Mondello, Benjamin Zwirn, Donald DeRiggi, Lewis Yevoli, and Bruce Nyman were members of the former Board of Supervisors. The defendant David Kane is the Commissioner of the Nassau County Police Department, responsible for enforcement of Local Law 11–1992. For the sake of clarity, the Court will refer to individual defendants and the defendant County of Nassau together as the "defendants" or the "County."

Local Law 11–1992, which was enacted by the defendants, became operative on June 16, 1992, and provides as follows:

### DISSEMINATING INDECENT CRIME MATERIAL TO MINORS

\* \* \* \* \* \*

Section 1. Legislative Intent

The Board of Supervisors finds that in light of their limited experience, education and emotional development, children under the age of seventeen are impressionable and susceptible to the influence of violence and criminal conduct in our society. The dissemination of materials devoted to the depiction of heinous crimes and heinous criminals is a contributing factor to juvenile crime, a basic factor in impairing the ethical and moral development of our youth and a clear and present danger to the citizens of Nassau County. The County has a responsibility and an exigent interest to protect the welfare of its children and to see that they are safeguarded from influences which might prevent their growth into free and independent well-developed citizens by preventing the distribution to children of material deemed harmful to children.

The Board of Supervisors further finds that for generations, children have purchased and collected trading cards depicting war heroes, sports heroes and other luminaries whom they revere and emulate. In such form, trading cards are not harmful to children when, however, trading cards which depict heinous crimes and heinous criminals and which appeal to the depraved interest of minors in crime are disseminated to our youth, they are harmful.

Section 2. Definition of Terms

A. "Minor" means and [sic] person under the age of seventeen.

B. "Trading Card" means any card, souvenir card, playing card or game card commonly known as a trading card.

C. "Heinous Crime" means murder, assault, kidnapping, arson, burglary, robbery, rape or other sexual offense.

D. "Heinous Criminal" means a person who has been convicted of a heinous crime or who has been found not criminally responsible by reason of mental disease or defect for criminal conduct concerning the commission of a heinous crime.

E. "Harmful to Minors" means that quality of any description or representation in whatever form of a heinous crime, an element of a heinous crime or a heinous criminal, when it:

1. Considered as a whole, appeals to the depraved interest of minors in crime; and

2. Is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors; and

3. Considered as a whole, lacks serious literary, artistic, political and scientific value for minors.

Section 3. Disseminating Indecent Crime Material to Minors

A person is guilty of disseminating indecent crime material to minors when, with knowledge of its character and content, he sells or loans to a minor for monetary consideration in Nassau County any trading card which depicts a heinous crime, an element of heinous crime, or a heinous criminal and which is harmful to minors. Disseminating indecent crime material to minors shall be a Class A misdemeanor.

Section 4. Presumption and Defense

A. A person who engages in the conduct prescribed by Section 3 of this Title is presumed to do so with knowledge of the character and content of the material sold or loaned.

B. In any prosecution for disseminating indecent crime material to minors, it is an affirmative defense that:

1. The defendant had reasonable cause to believe that the minor involved was seventeen years old or made [sic]; and

2. Such mionor [sic] exhibited to the defendant a draft card, driver's license, birth certificate or other official or apparently official document purporting to establish that such minor was seventeen years old or more.

Section 5. Severability

If any clause, sentence, paragraph, subdivision, section or part of this Title or its application to any person or circumstance shall be adjudged by any court of competent jurisdiction to be invalid or unconstitutional, such order of judgment shall not affect, impair or invalidate the remainder thereof, but shall be confined in its operation to the clause, sentence, paragraph, subdivision, section or part of this Title or its application to the person or circumstance directly involved in the controversy in which such judgment or order shall be rendered.

Nassau County, Local Law No. 11–1992.

On July 21, 1992, the plaintiffs filed their Complaint in federal court alleging violations of their free speech, due process and equal protection rights under the First, Fifth and Fourteenth Amendments of the United States Constitution and Article I, sections 6, 8 and 11 of the New York State Constitution. As a result, they ask the Court to declare Local Law 11–1992 invalid on its face, permanently enjoin its enforcement, and award them money damages and attorneys' fees. The defendants filed their Answer on August

11, 1992 denying the material allegations contained in the Complaint and stating, among other things, that the "[d]efendants have properly exercised their legislative prerogatives in enacting Local Law 11–1992. [The d]efendants have a valid governmental interest in . . . protect[ing] the health, welfare and safety of its minor population."

On November 12, 1993, the Court denied both the plaintiffs' and the defendants' motions for summary judgment pursuant to Fed.R.Civ.P. 56 without prejudice and subject to renewal upon the conclusion of an evidentiary hearing to be held by United States Magistrate Judge Michael L. Orenstein pursuant to Fed.R.Civ.P. 43(e). The purpose of the evidentiary hearing was to consider the following issues:

1. Whether Nassau County Local Law 11–1192 is narrowly tailored, *i.e.,* employs the least restrictive means available, to serve the County's compelling interest in providing for the well-being of minors and otherwise serving the legislative intent underlying the statute.

2. Whether the types of trading cards prohibited by the statute are "Harmful to Minors," as that term is defined in the statute.

Magistrate Judge Orenstein filed a Report and Recommendation on October 6, 1995 ("Rep. & Rec.") in which he made the following determinations:

Nassau County Local Law Number 11–1992 is 1) an unconstitutional restraint of free speech in that it is not narrowly tailored to further the ordinance's stated purpose; 2) is overbroad and 3) is void for vagueness. The Court further finds that no definitive evidence was presented at the hearing from which this Court could conclude that the type of trading cards at issue are "harmful to minors" as defined in the statute. Moreover, Defendant failed to present evidence to support its claimed connection between the trading cards in question and the commission of or increase in juvenile crime, or that the cards impair

the "moral and ethical development" of youth.

*See* Rep. & Rec. at 17–18.

On October 23, 1995, the defendants filed their Objections to the Report and Recommendation. In response to the objections the plaintiffs renewed their motion for summary judgment pursuant to Fed.R.Civ.P. 56.

II. *Discussion*

A. *The report and recommendation*

As stated above, in his Report and Recommendation, Magistrate Judge Orenstein made four determinations with respect to the constitutionality and applicability of Local Law 11–1992: (1) the ordinance is not narrowly tailored to further its stated purpose; (2) the ordinance is overbroad; (3) the ordinance is vague; and (4) the County was unable to demonstrate that the trading cards were "harmful to minors" or relevant to any "increase in juvenile crime" as provided in the statute. *See* Rep. & Rec. at 17–18.

The County makes eight objections to the report and recommendation:

1. That Judge Orenstein misunderstood the purpose of the ordinance, and therefore the related analysis as to whether it is narrowly tailored to that purpose, was flawed;

2. That Local Law 11–1992 is sufficiently narrowly tailored to its purpose;

3. That the ordinance is not overbroad;

4. That Local Law 11–1992 is sufficiently definite and should not be found void for vagueness;

5. That Judge Orenstein should have found that trading cards have a unique effect on minors;

6. That the *Miller* standard for obscenity should be extended to cover violent material distributed to minors;

7. That the unconstitutional portions of the ordinance should have been severed rather than finding the entire ordinance unconstitutional; and

8. That there is sufficient evidence to support the County's conclusion that trading cards depicting violence are harmful to minors.

### B. The standard of review

As stated above, this matter was referred to Magistrate Judge Orenstein to report and recommend pursuant to Fed.R.Civ.P. 43 as to whether Local Law 11–1992 is narrowly tailored to a compelling state interest; and whether the trading cards are "harmful to minors" as that term is applied in the ordinance. Because the report and recommendation is dispositive as to the rights of the parties, the Court will conduct a de novo review. *See* 28 U.S.C. § 636(b)(1); Fed. R.Civ.P. 72(b); *see also Goffman v. Gross*, 59 F.3d 668, 671 (7th Cir.1995).

### C. Local Law 11–1992

Section 3 of Local Law 11–1992 makes it unlawful to "disseminat[e] ... any trading card which depicts a heinous crime, an element of a heinous crime, or a heinous criminal and which is harmful to minors." The term "heinous crime" is defined as "murder, assault, kidnapping, arson, burglary, robbery, rape or other sexual offense." Nassau County, Local Law 11–1992 § 2(C). The term "heinous criminal" means "a person who has been convicted of a heinous crime or who has been found not criminally responsible by reason of mental disease or defect for criminal conduct concerning the commission of a heinous crime." Nassau County Local Law 11–1992 § 2(D). The term "harmful to minors" is defined as:

> any description or representation in whatever form of a heinous crime, an element of a heinous crime or a heinous criminal, when it:
>
> 1. Considered as a whole, appeals to the depraved interest of minors in crime; and
> 2. Is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors; and
> 3. Considered as a whole, lacks serious literary, artistic, political and scientific value for minors.

Nassau County, Local Law 11–1992 § 2(E).

### 1. Violence as protected speech

■ Historically, categories of speech denied protection under the First Amendment have been narrowly confined to obscenity, *see Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), defamation, *see Beauharnais v. Illinois*, 343 U.S. 250, 72 S.Ct. 725, 96 L.Ed. 919 (1952), fighting words, *see Chaplinsky v. New Hampshire*, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), and direct advocacy of imminent lawless action, *see Brandenburg v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969). These classifications have never been expanded to include speech depicting acts of violence. *See Video Software Dealers Ass'n v. Webster*, 968 F.2d 684, 688 (8th Cir.1992).

In *Winters v. New York*, 333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840 (1948), the Supreme Court held that magazines, newspapers and other written materials which are devoted to the publication of stories of "bloodshed," "lust" or "crime" are protected by the First Amendment. In reaching this conclusion, the court recognized "a state's police power to minimize all incentives to crime, particularly in the field of sanguinary or salacious publications with their stimulation of juvenile delinquency." *Id.* at 510, 68 S.Ct. at 667. Nevertheless, the court rejected the opinion of the New York Court of Appeals that the state legislature could prohibit the distribution of material depicting criminal activity which constitutes "accumulations of details of heinous wrongdoing which plainly carried an appeal to that portion of the public who ... are disposed to take vice for its own sake." *Id.* at 513, 68 S.Ct. at 669 (internal quotation omitted).

More recently, the Court of Appeals for the Eighth Circuit has recognized that videos "depicting violent conduct" are also shielded by the First Amendment. *Video Software Dealers Ass'n v. Webster*, 968 F.2d at 688. Other courts have found representations of violence similarly protected. For example, in *American Booksellers Ass'n v. Hudnut*, 771 F.2d 323 (7th Cir.1985), *aff'd*, 475 U.S. 1001, 106 S.Ct. 1172, 89 L.Ed.2d 291 (1986), a decision addressing the constitutionality of an ordinance that defines pornography as a practice that discriminates against women, Judge Easterbrook recognized that "violence

on television" is protected speech. *Id.* at 329–30; *see also Delcarpio v. St. Tammany Parish Sch. Bd.,* 865 F.Supp. 350, 362 (E.D.La.1994) (decision of school board to ban book which contained voodoo "spells," some of which required the use of weapons or killing animals, was violative of the First Amendment); *Sovereign News Co. v. Falke,* 448 F.Supp. 306, 394 (N.D.Ohio 1977) ("[m]aterial limited to forms of violence is ... given the highest degree of [First Amendment] protection") (subsequent history omitted); *cf. Davis–Kidd Booksellers, Inc. v. McWherter,* 866 S.W.2d 520, 531–32 (Tenn.1993) (applying the constitutional vagueness standard to a state statute prohibiting the display of visual depiction of material "harmful to minors" which includes any "representation" of "excessive violence" and holding that any deficiency "is not cured by incorporating violence in the definition of obscenity as to minors").

Other cases affording First Amendment protection to defendants who allegedly caused violent acts leading to personal injury (not relating to the imminent danger doctrine), as the result of imitation or otherwise, include: *Zamora v. CBS,* 480 F.Supp. 199 (S.D.Fla.1979) (no cause of action stated against television networks for allegedly permitting child to become so "intoxicated" by television that he was incited to shoot and kill a neighbor); *DeFilippo v. NBC, Inc.,* 446 A.2d 1036 (R.I.1982) (holding that First Amendment barred recovery against broadcaster in action based on death of 13–year–old who hung himself after he had watched a mock hanging on television); *Bill v. Superior Court,* 137 Cal.App.3d 1002, 187 Cal.Rptr. 625 (1982) (holding that the First Amendment required granting summary judgment to film producers of violent movie where lawsuit was brought by girl shot outside the theater where the film was being shown); *Olivia N. v. NBC, Inc.,* 126 Cal.App.3d 488, 178 Cal.Rptr. 888 (1981) (holding that absent incitement, and despite broadcaster's knowledge of studies showing that susceptible persons might imitate television violence, First Amendment barred lawsuit filed by 9–year–old victim of sex crime by minors allegedly imitating crime they witnessed on television).

This is not to say that all attempts to control dissemination of speech depicting acts of violence is necessarily unconstitutional. *See Pacifica Foundation v. FCC,* 556 F.2d 9, 29 (D.C.Cir.1977) (Bazelon, J. concurring) (noting that "the prevalence of violence, is a serious concern" which will continue to "pressure" First Amendment concerns), *rev'd,* 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978). In *Betts v. McCaughtry,* 827 F.Supp. 1400, 1404, 1406–07 (W.D.Wis.1993), *aff'd,* 19 F.3d 21 (7th Cir.1994), the district court upheld a prison's censorship of certain rap music which is determined to "incite or encourage violence." However, in reaching this conclusion the Court recognized that the First Amendment rights of prisoners are subject to a different level of scrutiny than those applied to the general population. *See id.* at 1406 ("An infringement of an inmate's First Amendment rights is permissible if it is 'reasonably related to legitimate penological interests[,]'" which includes the maintenance of a safe and secure prison environment). Applying this standard, the court also relied upon the facts that the rap music censored was prohibited without regard to offensiveness and that prison life was unique as the result of the especially "assaultive nature" of the prison population. *Id.* at 1407.

Nevertheless, despite the upholding of censorship of certain speech because of its violent content by some courts, at least one government agency has taken the position that the general regulation of such speech is a thorny proposition better left to private parties themselves. *See Report on the Broadcast of Violent, Indecent, and Obscene Material,* 51 F.C.C.2d 418, 420–22 (1975) (noting that "[r]egulatory action [in television] to limit violent ... programming which is neither obscene nor indecent is less desirable than effective self-regulation, since government-imposed limitations raise sensitive First Amendment problems").

### 2. *Content-based speech*

■ Having determined that speech containing or depicting acts of violence is safeguarded by the First Amendment, the Court now considers the appropriate level of protection. This determination turns upon

whether the regulation at issue is content-based or content-neutral. *See Turner Broadcasting Sys., Inc. v. FCC,* 512 U.S. 622, ——, 114 S.Ct. 2445, 2459, 129 L.Ed.2d 497 (1994). "[L]aws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content-based[,]" as opposed to laws "that confer benefits or impose burdens on speech without reference to the ideas or views expressed are in most instances content-neutral." *Turner Broadcasting,* 512 U.S. at ——, 114 S.Ct. at 2459. Those " '[r]egulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment.' " *Simon & Schuster, Inc. v. New York State Crime Victims Bd.,* 502 U.S. 105, 116, 112 S.Ct. 501, 508, 116 L.Ed.2d 476 (1991), quoting, *Regan v. Time, Inc.,* 468 U.S. 641, 648–49, 104 S.Ct. 3262, 3267, 82 L.Ed.2d 487 (1984). As a result, Supreme Court precedent "appl[ies] the most exacting scrutiny to regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content." *Turner Broadcasting,* 512 U.S. at ——, 114 S.Ct. at 2459. Accordingly, the defendants are required to prove that the regulation at issue is narrowly tailored to promote a compelling government interest. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 954–55, 74 L.Ed.2d 794 (1983).

■ Applying this distinction, namely the difference between content-based and content-neutral speech, the Court adopts the Report and Recommendation of Magistrate Judge Orenstein that Local Law 11–1992 is a content-based restriction. Rep. & Rec. at 7. The ordinance prohibits the sale to minors of trading cards which depict violent acts, while not subjecting analogous cards to similar restrictions. For example, the ordinance would prohibit the sale of Eclipse's "True Crime" series, which is comprised of cards depicting historical figures such as Al Capone and Eliot Ness. Each card contains a brief and accurate discussion of the individual's noteworthy activities. However, other trading cards, such as baseball cards, which contain similar information about sports heroes, are not covered by the ordinance. Ac-

cordingly, in order to survive constitutional scrutiny, the County is obligated to demonstrate that Local Law 11–1992 is narrowly tailored to meet a compelling government interest.

Having articulated the standard by which the ordinance must be measured, the Court now turns to the County's objections to the report and recommendation.

### 3. Is the Ordinance Narrowly tailored to meet a compelling government interest?

■ The first two objections relate to Judge Orenstein's determination that Local Law 11–1992 is unconstitutional because it is not narrowly tailored to meet a compelling government interest. In their first objection, the County contends that the report and recommendation misapprehends the stated purpose of the ordinance. As a result, according to the County, the Report and Recommendation misapplied the strict scrutiny standard requiring the statute to be narrowly tailored to that purpose.

As set forth above, Local Law 11–1992 § 1, entitled "Legislative Intent," provides:

The Board of Supervisors finds that in light of their limited experience, education and emotional development, children under the age of seventeen are impressionable and susceptible to the influence of violence and criminal conduct in our society. The dissemination of materials devoted to the depiction of heinous crimes and heinous criminals is a contributing factor to juvenile crime, a basic factor in impairing the ethical and moral development of our youth and a clear and present danger to the citizens of Nassau County. The County has a responsibility and an exigent interest to protect the welfare of its children and to see that they are safeguarded from influences which might prevent their growth into free and independent well-developed citizens by preventing the distribution to children of material deemed harmful to children.

The Report and Recommendation finds that the "stated purpose of Local Law 11–1992 is to protect the welfare of children

generally, and 1) prevent juvenile crime and 2) ensure the proper and moral and ethical development of county youth specifically." Rep. & Rec. at 2–3. The County takes issue with this interpretation, arguing instead that the purpose of the ordinance, according to its own language, is to "prevent[ ] the distribution to children of material deemed harmful to children." The Court disagrees.

While the defendants accurately quote a portion of the Local Law's legislative intent, they selectively restrict their interpretation to one phrase and apply this statement in a vacuum. In addition to providing that the statute is designed to prevent distribution of the trading cards to children, section one also specifies a broader goal, namely elimination of the "dissemination of materials devoted to the depiction of heinous crimes and heinous criminals" because they represent a "contributing factor to juvenile crime." Nassau County, Local Law 11–1992 § 1. It is only when considering both facets of the legislative intent, namely to limit the dissemination of harmful material to minors, and to reduce incidents of juvenile crime, that the true purpose of the ordinance can be analyzed under the First Amendment. Accordingly, the County's first objection to the report and recommendation is rejected.

 Given this purpose, the Court must determine whether Local Law 11–1992 is sufficiently narrowly tailored to meet a compelling state interest. Addressing the latter requirement first, the Court recognizes that protecting the physical and psychological well being of minors does constitute a compelling governmental interest. *Sable Communications, Inc. v. FCC*, 492 U.S. 115, 126, 109 S.Ct. 2829, 2836–37, 106 L.Ed.2d 93 (1989). Further, the government's ability to regulate communicative materials available to children is somewhat broader than its power to regulate material available to adults. *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212, 214 n. 11, 95 S.Ct. 2268, 2274, 2275 n. 11, 45 L.Ed.2d 125 (1975). "Nevertheless, minors are entitled to a significant measure of First Amendment protection, ... and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materi-

al to them." *Id.* at 212–13, 95 S.Ct. at 2274 (citations omitted). Accordingly,

[s]peech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them. In most circumstances, the values protected by the First Amendment are no less applicable when government seeks to control the flow of information to minors.

*Id.* at 213–14, 95 S.Ct. at 2275.

 In addition, the Court appreciates that the County is not required to draft its legislation with scientific certainty. *See Ginsberg v. New York*, 390 U.S. 629, 642–43, 88 S.Ct. 1274, 1282–83, 20 L.Ed.2d 195 (1968). However, as one constitutional scholar has noted, the "government must come forward with sufficient proof to justify convincingly its abridgment of the constitutional right to speak." Laurence H. Tribe, American Constitutional Law § 12–8, at 834 (2d ed. 1988); *see Linmark Assocs., Inc. v. Township of Willingboro*, 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977) (holding ordinance prohibiting "for sale" signs on real estate is unconstitutional). In *Linmark*, the record developed by the Town in order to justify the ordinance was sufficient to persuade the Court of Appeals that Willingboro was experiencing a "white flight" panic selling spree and that a "fear psychology" had developed, but not compelling enough to convince the Supreme Court that an "emergency" existed sufficient to justify the suppression of otherwise protected speech. *Id.*

 As Judge Orenstein recognized in the Report and Recommendation, even in the commercial speech context, with its more lenient standard of review, the legislative body seeking to maintain a restriction on protected speech must establish that the restriction directly advances the state interest involved. Rep. & Rec. at 8. *Edenfield v. Fane*, 507 U.S. 761, 767, 770, 113 S.Ct. 1792, 1798, 1799–1800, 123 L.Ed.2d 543 (1993) (recognizing that the standard of review for commercial speech is whether the regulation is "tailored in a reasonable manner to serve a substantial state interest"), citing, *Central*

*Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York,* 447 U.S. 557, 564, 100 S.Ct. 2343, 2350, 65 L.Ed.2d 341 (1980). As the *Edenfield* Court stated, "the regulation may not be sustained if it provides only ineffective or remote support for the government's purpose." *Edenfield,* 507 U.S. at 770, 113 S.Ct. at 1800 (citations omitted). "[M]ere speculation or conjecture" will not suffice. *Id.* The government must do more than " 'posit the existence of the disease sought to be cured.' " *Turner Broadcasting,* 512 U.S. at ——, 114 S.Ct. at 2470, quoting, *Quincy Cable TV, Inc. v. FCC,* 768 F.2d 1434, 1455 (D.C.Cir.1985), *cert. denied,* 476 U.S. 1169, 106 S.Ct. 2889, 90 L.Ed.2d 977 (1986). To this end, the lack of any studies, empirical data, or anecdotal evidence supporting the restriction will contribute to a finding of unconstitutionality. *Edenfield,* 507 U.S. at 771, 113 S.Ct. at 1800–01.

Applying these standards, the Report and Recommendation concludes that the evidence presented by the County in support of the state interest advanced in the passage of Local Law 11–1992 is so "weak and insufficient" that it cannot withstand constitutional scrutiny. Rep. & Rec. at 8. In objecting to this conclusion the defendants argue that the Report and Recommendation:

> fails to recognize that state and local governments routinely and [c]onstitutionally restrict minors' access to material deemed harmful to minors or material that in the hands of minors would present a "danger to the citizens." (Local Law 11–1992 § 1). Items prohibited to minors include tobacco, spray paint, obscenity, box cutters, guns and alcohol. Legislative motivation for these restrictions are centered around these items being harmful to minors, a contributing factor to juvenile crime or impairment to moral development and a danger to the citizenry.

Obj. to Rep. & Rec. at 3.

The thrust of this argument ignores the reasoning of the Report and Recommendation. The relevant issue addressed in the Report and Recommendation is not whether a state or local legislature may protect its children from dangerous material such as tobacco or guns. Rather, the focus is upon whether minors' constitutional free speech rights may be infringed where the enacting body presents little or no evidence that the speech prohibited, namely the historical content loaded trading cards, will achieve the purpose of the ordinance, in this case to reduce juvenile crime.

As Judge Orenstein recognized, the County has failed to satisfy their constitutionally imposed burden. Local Law 11–1992 concludes that the dissemination of trading cards depicting "heinous crimes and heinous criminals is a contributing factor to juvenile crime, a basic factor in impairing the ethical and moral development of [County] youth." Nassau County, Local Law 11–1992 § 1. The ordinance states that the trading cards are "harmful" material without any support for this conclusion. At the hearing before Judge Orenstein, one member of the County Board of Supervisors, Gregory Peterson, admitted that prior to enacting Local Law 11–1992, there was no evidence linking any trading cards to juvenile crime. Indeed, surprisingly, the Board never even contacted the Nassau County Police Department to determine whether the trading cards played a role in any crimes. Testimony of Gregory Peterson, member of Nassau County Board of Supervisors, Hearing Transcript "Tr." 4:73–74.[1] Further, the Board did not consult any mental health professionals, such as psychiatrists or psychologists, to determine whether the cards were "harmful" to minors. Peterson, Tr. 4:74. In addition, the Board did not commission any type of study with regard to whether the trading cards contributed to juvenile crime. Nor did the Board rely on an already existing study for the same conclusion. Peterson, Tr. 4:76. According to one of the defense witnesses, the County could not have depended on such information because there is no existing study addressing this alleged causal link. Testimony of Dr. Sandra Kaplan, Tr. 1:57–58; Testimony of Dr. Miriam Miedzan, 1:198. Significantly, during the hearing, one of the members of the Board of Supervisors admitted that the conclusory statement in the Local Law's Legislative Intent section that "the depiction

1. n:pp indicates the volume of the hearing tran- script followed by the page number.

of heinous crimes and criminals is a contributing factor in impairing the ethical and moral development of our youth" was based on sheer "surmise." Peterson, Tr. 4:83–85.

Most of the testimony that was given by the County witnesses addressed violence in the media. However, most studies in this area address violence on television as opposed to violence in literature, which form of expression is more closely related to the trading cards. Television is a vibrant visual medium which also engages an individual's hearing. Literature, although it involves the sense of sight, is a much more subtle vehicle in which to convey information. As the plaintiffs' expert witness, Professor of Social Psychology, Jonathan Freedman, testified, "the vividness of T.V. or movies ... makes them ... have much more impact under most circumstances ... than still pictures and still pictures have much more impact than just the printed page...." Freedman, Tr. 3:101–02. Accordingly, any effect the trading cards might have on minors "would be vanishingly small as you moved from the very powerful medium and vivid medium of television to the weaker and weaker mediums, with the printed page, particularly for children being the weakest medium." *Id.* at 3:102.

Even if the Court ignores the distinction between television and literature, the County's efforts must nevertheless fail because the defendants have not established that trading cards are any more harmful to minors than books on the same subjects. As the plaintiffs point out, the information contained in the trading cards is also available in the public library. *See* Pl.Exhs. 24, 25. Yet, the County does not explain why one medium is lawful and the other is prohibited.

Moreover, even if the Court were to find that studies on violence in television would control an ordinance prohibiting distribution of trading cards, the literature regarding the causal link between television violence and crime is inconclusive. *See* Stephen J. Kim, Comment, *Viewer Discretion is Advised: A Structural Approach to the Issue of Television Violence,* 142 U.Pa.L.Rev. 1383, 1383–85 (1994) (recognizing that "[f]or forty years, television activists, legislators, social scien-

tists, and members of the television industry have debated all sides of the issue"); Laura B. Schneider, Comment, *Warning: Television Violence May Be Harmful to Children; But the First Amendment May Foil Congressional Attempts to Legislate Against It,* 49 U.Miami L.Rev. 477, 482 and n. 30 (1994) (stating that studies indicate a causal link between exposure to television violence and subsequent aggressive behavior, but also noting criticism of these studies citing Emily Campbell, Comment, *Television Violence: Social Science vs. The Law,* 10 Loy.Ent.L.J. 413, 419–436 (1990)). Accordingly, having reviewed the County's objections to the Report and Recommendation, the Court now finds that the County has failed to establish that Local Law 11–1992 is narrowly tailored to meet a compelling state interest and the objections to the Report and Recommendation in this regard are rejected.

 Having determined that Local Law 11–1992 is unconstitutional because the County has failed to establish that trading cards depicting heinous crimes are harmful to minors, and that the ordinance is not narrowly tailored to meet a compelling state interest, the Court need not address the County's remaining objections. Nevertheless for the sake of clarity, the Court will take the time to consider one remaining objection, that Judge Orenstein failed to sever the unconstitutional portions of Local Law 11–1992 rather than find entire ordinance unconstitutional. With respect to severability, the Second Circuit has recently recognized:

The determination of whether an invalid portion of a state statute can be severed from the valid portions so that the remainder of the statute can be preserved is a question of state law. *National Advertising Co. v. Town of Niagara,* 942 F.2d 145, 148 (2d Cir.1991). Under New York law, "a court should refrain from invalidating an entire statute when only portions of it are objectionable." *Id.* Although the presence of a severability clause is not dispositive, "[t]he preference for severance is particularly strong when the law contains a severability clause." *Id.* New York state courts apply the following stan-

dard to determine whether severance is appropriate:

> The question is in every case whether the legislature, if partial invalidity had been foreseen, would have wished the statute to be enforced with the invalid part exscinded, or rejected altogether. The answer must be reached pragmatically, by the exercise of good sense and sound judgment, by considering how the statutory rule will function if the knife is laid to the branch instead of the roots.

*People ex rel. Alpha Portland Cement Co. v. Knapp*, 230 N.Y. 48, 60, 129 N.E. 202 (1920), *cert. denied*, 256 U.S. 702, 41 S.Ct. 624, 65 L.Ed. 1179 (1921).

*Gary D. Peake Excavating Inc. v. Town Board of the Town of Hancock*, 93 F.3d 68 (2d Cir.1996).

Weighing in favor of severance is section 5 of the ordinance which demonstrates that the County intended that Local Law 11–1992 survive even when the invalid portions are "exscinded." Section 5 of the Local Law 11–1992 provides that:

> If any clause, sentence, paragraph, subdivision, section or part of this Title or its application to any person or circumstance shall be adjudged by any court of competent jurisdiction to be invalid or unconstitutional, such order of judgment shall not affect, impair or invalidate the remainder thereof, but shall be confined in its operation to the clause, sentence, paragraph, subdivision, section or part of this Title or its application to the person or circumstance directly involved in the controversy in which such judgment or order shall be rendered.

Applying section 5, the County contends that Local Law 11–1992 is valid at least to the extent it prohibits depictions of "rape and other sexual offense[s]." The Court disagrees.

As stated above, the purpose of the Local Law 11–1992 is to prohibit the sale of trading cards to minors which depict heinous crimes or heinous criminals in order to reduce incidents of juvenile crime. However, the County offers no proof that there is any causal link between the trading cards and such crimes regardless of whether such crimes are sexual in nature. Accordingly, the Court expressly rejects the County's objection based on Judge Orenstein's failure to sever a portion of the ordinance rather than find it unconstitutional in its entirety.

In reaching this conclusion, the Court is cognizant that depictions of sexual crimes may, under some circumstances constitute obscenity. *See Miller*, 413 U.S. at 23–24, 93 S.Ct. at 2614–15 (defining obscenity which may be regulated under the First Amendment as that material which depicts "sexual conduct" that "taken as a whole, appeal[s] to the prurient interest in sex, which portray[s] sexual conduct in a patently offensive way, and which taken as a whole, do[es] not have serious literary, artistic, political, or scientific value"). Nevertheless, approaching the ordinance "pragmatically, ... with good sense and sound judgment," the Court finds that such an attempt to salvage the fraction of the statute that covers depictions of sexual crimes would be inappropriate. As discussed above, and in further detail below. The trading cards contain portraits of individuals, such as Al Capone and Eliot Ness, and historical events, such as the St. Valentine's Day Massacre with brief descriptions of each. The parties do not contest the accuracy of the cards or any information contained therein, all of which is readily available at the public library. Accordingly, the Court finds as a matter of law that the cards contain literary, artistic and political value so as to render any analogy to obscenity inappropriate.

### D. *The trading cards are not "harmful to minors"*

In conclusion, the Court notes that even if Local 11–1992 could survive constitutional scrutiny, the plaintiffs would be entitled to judgment in their favor. Local Law 11–1992 provides that an individual will violate the ordinance when he or she disseminates to minors trading cards which depict a heinous crime or heinous criminal *and* which are harmful to minors. "Harmful to minors" is defined as any depiction of a heinous crime or heinous criminal which: "(1) [when c]onsidered as a whole, appeals to the depraved

interest of minors in crime; and (2) [i]s patently offensive to prevailing standards in the adult community as whole with respect to what is suitable material for minors; and (3) [when c]onsidered as a whole, lacks serious literary, artistic, political and scientific value for minors." Nassau County, Local Law 11–1992 § 2(E).

Applying this standard, and after a review of the trading cards manufactured by Eclipse and admitted into evidence, the Court finds that the cards have sufficient literary, artistic and political value to withstand prosecution under the ordinance. For example, the "True Crime" series, plaintiffs' exhibit 10, is comprised of trading cards, each with a portrait of an individual or scene on the front. Included in the series are cards titled "Al Capone," "St. Valentine's Day Massacre," "Eliot Ness," "The Untouchables," "Capone in Jail," "Lindbergh Kidnapping," "Bonnie & Clyde," "Death of Bonnie & Clyde," "John Dillinger," "J. Edgar Hoover," "Ma Barker & her boys," "Bugsy Siegel," and "David Berkowitz." On the back of the cards are brief descriptions of the individual's criminal or law enforcement activities, the accuracy of which is not challenged. All of the information provided would be readily available in any public library. Accordingly, while the Court appreciates the unseemly and offensive nature of some of the acts portrayed, the Court nevertheless finds that even if Local Law 11–1992 were upheld, the plaintiffs trading cards would not violate the ordinance's provisions. As a result, in addition to the constitutional deficit, Eclipse and Comics would still be entitled to judgment in their favor on this additional ground.

III. *Conclusion*

Having reviewed the parties' submissions and the record, and for the reasons set forth above, it is hereby

ORDERED, that the plaintiffs' renewed motion for summary judgment pursuant to Fed.R.Civ.P. 56 is granted; is further

ORDERED, that the October 6, 1995 Report and Recommendation of United States Magistrate Judge Michael L. Orenstein is adopted as the decision of this Court inasmuch as it determines that Nassau County,

Local Law 11–1992 is unconstitutional because it is not narrowly tailored to meet a compelling state interest. As a result, Local Law 11–1992 is invalid on its face; it is further

ORDERED, that the October 6, 1995 Report and Recommendation of Magistrate Judge Orenstein is adopted as the decision of this Court inasmuch as it determines that the trading cards are not "harmful to minors" as that term is applied in Nassau County, Local Law 11–1992; and it is further

ORDERED, that the parties are directed to attend a status conference with the Court on Thursday, October 17, 1996 at 9:00 a.m. to address the remaining issues, if any, in this case.

SO ORDERED.