ACCEPTED
14-14-00427-CR
FOURTEENTH COURT OF APPEALS
HOUSTON, TEXAS
4/9/2015 9:37:11 AM
CHRISTOPHER PRINE
CLERK

## No. 14-14-00427-CR

In the

### Court of Appeals

For the

### Fourteenth District of Texas

At Houston

FILED IN
14th COURT OF APPEALS
HOUSTON, TEXAS
4/9/2015 9:37:11 AM
CHRISTOPHER A. PRINE
Clerk

---

### Trial Court Cause No. 1260243
In the 339th District Court
of Harris County, Texas

---

## NARJES MODARRESI,
*Appellant*

v.

## THE STATE OF TEXAS,
*Appellee*

---

## APPELLANT'S BRIEF

---

**VIVIAN R. KING**
**State Bar No. 00784399**
**2202 Alabama Street**
**Houston, Texas 77004**
**Tel.: (713) 222-2019**
**Fax: (877) 753-6706**

**Appointed Attorney for Appellant**

### ORAL ARGUMENT WAIVED

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to **Tex.R.App.P. 39.1 and 39.7**, Appellant waives oral argument herein since argument would not significantly aid the court in determining the legal and factual issues presented in the appeal.

## NAMES OF ALL PARTIES TO TRIAL COURT'S FINAL JUDGMENT

Pursuant to **Tex.R.App.P. 38.1(a)** a complete list of the names of all interested parties is provided below.

Appellant:
> **NARJES MODARRESI**

Counsel for Appellant on Appeal:
> **VIVIAN R. KING**
> SBN: 00784399
> 2202 Alabama Street
> Houston, TX 77004
> (713) 222-2019 Telephone
> (877) 753-6706 Fax

Counsel for Appellant at Trial:
> **GEORGE PARNHAM**
> SBN: 1553200
> **DEE McWILLIAMS**
> SBN: 24009361
> 440 Louisiana St., Suite 200
> Houston, Texas 77002
> Telephone: (713) 224-3967

Counsel for the State:
> **DEVON ANDERSON**, District Attorney of Harris County, Texas
> **DONNA LOGAN,** Assistant District Attorney *at trial*
> **Address for the above listed State's attorneys:**
> HARRIS COUNTY DISTRICT ATTORNEY'S OFFICE
> 1201 Franklin, 6th Floor
> Houston, Texas 77002
> 713-755-5800

Trial Judge: **THE HONORABLE MARIA JACKSON, Judge Presiding**

# TABLE OF CONTENTS       Page

STATEMENT REGARDING ORAL ARGUMENT……………………….. i

NAMES OF PARTIES AT TRIAL COURT'S FINAL JUDGMENT………. i

INDEX OF AUTHORITIES…………………………………………… iv-v

STATEMENT OF THE CASE…………………………………………1

ISSUES PRESENTED…………………………………………… 2-3

I:      THE TRIAL COURT ERRED BY DENYING APPELLANT'S MOTION TO DECLARE TEXAS PENAL CODE 12.31(a) and 19.03(a)(8) STATUTES AS UNCONSTITUTIONAL AS CRUEL AND UNUSUAL PUNISHMENT PROHIBITED BY THE EIGHT AMENDMENT OF THE UNITED STATES CONSTITUTION AND Art. 1 § 13 of THE TEXAS CONSTITUTION AS APPLIED TO THIS DEFENDANT WHO WAS SUFFERING FROM MENTAL ILL WHEN INCIDENT OCCURRED............................................................ 23

II.      THE TRIAL COURT ERRED BY DENYING APPELLANT'S MOTION TO DECLARE TEXAS PENAL CODE 12.31(a) and 19.03(a)(8) STATUTES AS UNCONSTITUTIONAL BECAUSE LIFE WITHOUT PAROLE SENTENCE ON A MENTALLY IS WOMAN CONVITED OF HOMICIDE VIOLATES THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND Art. 1 §§ 3, 13 of THE TEXAS CONSTITUTION WHICH PROHIBITS UNFAIRLY TARGETING AN ENTIRE CLASS OF PEOPLE—women with mental illness exacerbated by postpartum depression…... 29

III:      THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT CONVICTION FOR CAPITAL MURDER……. 32

IV.      THE TRIAL COURT ERRED BY DENYING THE DEFENDANT'S MOTION FOR NEW TRIAL………….. 34

STATEMENT OF FACTS…………………………………………………… 3

SUMMARY OF ARGUMENT……………………………………………. 23

ARGUMENT AND AUTHORITIES……………………………………… 23

PRAYER FOR RELIEF…………………………………………………….. 35

CERTIFICATE OF COMPLIANCE ……………………………………….. 35

CERTIFICATE OF SERVICE……………………………………………… 35

# INDEX OF AUTHORITIES

**FEDERAL SUPREME COURT CASES:** **PAGE:**

Atkins v. Virginia, 536 U.S. 304, 319 (2002)…………………………………… 28

Betts v. McCaughtry, 827 F. Supp. 1400, 1405 (W.D. Wis. 1993)…………… 31

Eddings v. Oklahoma, 450 U.S. 1040 (1981)………………………………… 24,25

Harmelin v. Michigan, 501 U.S. 957 (1991)…………………………………… 25

Hitchcock v. Dugger, 481 U.S. 393, (1987)………………………………….. 25

Jackson v. Virginia, *443 U.S. 307 (1979)*……………………………………. 31,33

Lockett v. Ohio, 438 U.S. 586 (1978)………………………………………… 24,25

Miller v. Alabama, 132 S. Ct. 2455 (2012)…………………………………… 25-28

Penry v. Lynaugh, 492 U.S. 302 (1982)……………………………………… 24

Plyler v. Doe, 457 U.S. 202 (1982)…………………………………………….. 30

Roper v. Simmons, 543 U.S. 551, 560 (2005)………………………………... 25

Smith v. Spisak, 558 U.S. 139 (2010............…………………………………… 24

Tennessee v. Lane, 541 U.S. 509, 522 (2004)………………………………… 31

Woodson v. North Carolina, 428 U.S. 280 (1976)………………………… 25

Yick Wo v. Hopkins, 118 U. S. 386, 369 (1886)……………………………… 31

**TEXAS COURT OF CRIMINAL APPEALS CASES:**

Brooks v. State, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010)…………… 33

Grice v. Alamo Cmty. College Dist., 2013 Tex. App. LEXIS 4999, 118 Fair Empl. Prac. Cas. (BNA) 354 (Tex. App.—San Antonio Apr. 24, 2013). …………… 31

Gear v. State, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011)……………… 33

Holden v. State, 201 S.W.3d 761, 763 (Tex.Crim.App.2006)………………  34

Robles v. State, 273 S.W.3d 322, 329 (Tex. Crim. App. 2008)…………….  33

State v. Rosseau, 396 S.W.3d 550, 557 (Tex. Crim. App. 2013)…………..  30

Wilkerson v. State, 347 S.W.3d 720
    (Tex. App. – Houston [14th Dist.] 2011, *pet. ref'd*)…………………….  25,26

Wood v. State, 18 S.W.3d 642, 651 (Tex. Crim. App. 2000)……………….  30

## CONSTITUTIONS:

U.S. CONST. amend VIII……………………………………………………..  25

TEX. CONST. art. 1 § 13……………………………………………………  25

U.S. CONST. amend XIV…………………………………………………….  30

## STATUTES:

TEX. PENAL CODE § 12.31(a)(2)…..................................................  24

Texas Penal Code §19.03(a)(8)……………………………………..  24

## LEGAL ARTICLES:

APA Statement of the Insanity Defense and Mental Illness.
Release No. 02-08, Washington, DC, APA, March 2002)………………  27

Jospeh Tussman and Jacobus tenBroek,
*The Equal Protection of the Laws*, 37 Cal. L. Rev. 341 (1949), available
at: http://scholarship.law.berkeley.edu/californialawreview/vol37/iss3/1

**TO THE HONORABLE COURT OF APPEALS:**

## STATEMENT OF THE CASE

Narjes Modarresi, Appellant in cause number 1260243, in the 339th District Court of Harris County, was indicted on July 20, 2010 for Capital Murder for intentionally causing the death of Masih Golabbakhsh, an individual under six years of age by placing his face down in the mud alleged to have occurred on April 21, 2010. [Clerk's Record (hereinafter CR), p.23]. Defense Counsel filed a motion to find Texas Penal Code §§12.31(a) and 19.03(a)(8) unconstitutional as applied in her case. [CR pp. 128, 1179]. The court denied this motion. [RR vol. 4, p. 24].

Defendant Modarresi then pled not guilty and requested jury punishment on May 14, 2014. [RR vol.4, p.12]. The jury found her guilty as charged on May 22, 2014. [CR p. 1651]. Mrs. Modarresi was automatically sentenced to Life in Prison without parole per the Judgment and Sentence. [CR p.1653]. Notice of Appeal was filed on May 22, 2014. [CR p.1658]. The Trial Court's Certification of Defendant's Right of Appeal was filed on May 22, 2014. [CR p.1657]. Appellant was deemed indigent. The undersigned attorney was appointed on May 28, 2014. [CR p.1661].

A Motion for New Trial was filed asking the court to hear mitigation testimony from Harris County Jail Chaplain, Cynthia Corder, that would have been proffered by the defense is Texas Law allowed mitigation testimony. [CR p. 1663]. Chaplain Corder testified that Appellant, while in jail awaiting trial for three years,

converted to Christianity and was a good person and model inmate. [RR vol. 10, p.3]. Chaplain Corder also submitted an affidavit. [CR p. 1673-1674]. The court held a hearing and denied the Motion for New Trial. [CR p. 1670; RR vol. 10 p.11]. This appeal follows.

## ISSUES PRESENTED

I:     THE TRIAL COURT ERRED BY DENYING APPELLANT'S MOTION TO DECLARE TEXAS PENAL CODE 12.31(a) and 19.03(a)(8) STATUTES AS UNCONSTITUTIONAL AS CRUEL AND UNUSUAL PUNISHMENT PROHIBITED BY THE EIGHT AMENDMENT OF THE UNITED STATES CONSTITUTION AND Art. 1 § 13 of THE TEXAS CONSTITUTION AS APPLIED TO THIS DEFENDANT WHO WAS SUFFERING FROM MENTAL ILL WHEN INCIDENT OCCURRED.

II.    THE TRIAL COURT ERRED BY DENYING APPELLANT'S MOTION TO DECLARE TEXAS PENAL CODE 12.31(a) and 19.03(a)(8) STATUTES AS UNCONSTITUTIONAL BECAUSE LIFE WITHOUT PAROLE SENTENCE ON A MENTALLY IS WOMAN CONVITED OF HOMICIDE VIOLATES THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND Art. 1 §§ 3, 13 of THE TEXAS CONSTITUTION WHICH PROHIBITS UNFAIRLY TARGETING AN ENTIRE CLASS OF PEOPLE—women with mental illness exacerbated by postpartum depression.

III:   THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT CONVICTION FOR CAPITAL MURDER.

IV.    THE TRIAL COURT ERRED BY DENYING THE DEFENDANT'S MOTION FOR NEW TRIAL.

## STATEMENT OF FACTS

On April 21, 2010, Houston Police Officer Gonzalez testified that he was dispatched to a location in Harris County for a welfare check. He drove to the location and saw three women waving him down. [RR vol.4, pp.63-64]. One of the lady's child had been kidnapped by a black male 25-30 dark curly hair with dark complexion wearing a t-shirt and had a tattoo on his left arm. Modarresi did not get a good look at the second man. The men were in a beige or brown Chevy 2-door car with the number 4 on the license plate. [RR vol. 4, pp.68-69]. A little later that day, homicide Sergeant Rubio interviewed Defendant Modaressi at the scene but got suspicious about her claim that the black guys took her baby. [RR, vol. 4, pp. 166,167,173]. Homicide Sergeant Chappell also made the scene of 8000 Woodway but focused his investigation on searching the area for the baby. [RR, vol. 4, p. 182]. Sergeant Chappell didn't find anything so he left the scene, but got a call to return to the scene at about 2am. [RR vol. 4, p. 190]. When he arrived Defendant was at the location with Officer Jafari, who speaks Farsi, Defendant's first language. [RR vol.4, pp. 190-191]. Officer Jafari led Chappell to a specific location where he saw a mound of leaves and mud and what appeared to be the back of a human head. [RR vol.4, p. 192]. The baby boy was found face down in mud and debris his hands holding mud. [RR vol.4, p.p. 20207-209]. Dr. Gumpeni, assistant Deputy Chief Medical Examiner for Harris County Institute of Forensic Sciences, performed the

autopsy on baby Masih Golabbakhs on April 22, 2010. [RR vol. 5, p. 12]. The cause of death was drowning and the manner of death was homicide. [RR vol.5, p26].

Amir Golabbakhsh, Modarresi's husband testified that he and Defendant had an arranged marriage. [RR vol.5, p. 49].They knew each other for a week before marrying in June of 2005. [RR vol.5, p. 53]. Shortly thereafter, they moved to the United States and lived with his parents. Defendant Modaressi was very close to her brother Rozbeh who lives in New Jersey. [RR vol.5, pp. 54-55]. At the time of their marriage, Amir did not know that Modaressi had bipolar disorder nor that she took medication. [RR vol.5, p. 57]. Amir described the first year of marriage as good. [RR vol.5, p. 64]. Their first child was Amir Mahdi. The pregnancy was normal. Defendant seemed happy to have the child. [RR vol. 5, p. 65]. Amir worked at a school in Clearlake. Defendant would sometimes visit Amir at his school along with his mother or father. Amir learned something was abnormal about the Defendant when an incident happened when Appellant and his mother visited him on campus. [RR vol. 5, pp. 67-68]. Defendant could not be found. Baby Amir was with his grandmother. They looked for Appellant for about 30 minutes. The campus officers found her and brought Amir to Appellant. The campus officers told Amir she was running after cars or waving at cars or doing something very dangerous. [RR vol.5, p. 73]. When Amir saw her, Appellant was shivering and cold and seemed like she was in pain. She wasn't able to walk. [RR vol. 5, pp. 68-71]. After midnight, Amir

decided to take her to the hospital because she started walking as a child. She was crawling and it was if she was not there. When she was asked questions, she wasn't responding with correct answers. [RR vol. 5, p. 72]. The doctor's admitted Appellant to the psychiatric unit. [RR vol.5, p. 73]. Eventually, Modaressi's behavior went back to normal after about 26 days in the psychiatric unit. During this hospitalization, Amir first learned that Appellant had bipolar disorder. The doctor's also said it was postpartum depression. Then Amir contacted Modaressi's brother in New Jersey to learn more about her past. [RR vol.5, pp. 80]. Modaressi medical records showed that she had been treated for bipolar mood disorder in Iran by Dr. Hatefi on September 25, 1999. [RR vol. 5, pp 132-134]. Modaressi was treated in Iran by Dr. Hatefi for hypomanic symptoms on May 14, 2006. [RR vol. 5, p. 136]. The hospital doctors assigned Modaressi to MHMRA (Mental Health Mental Retardation Authority). She saw Dr. Janarthanon about once a month. Modaressi was given medicine for her episodes. Depakote and Zyprexa were two of the drugs. [RR vol. 5, pp. 81-82]. Amir noticed that Appellant was not the same as before the pregnancy. She slept a lot more and her motivation wasn't there anymore. She was able to take care of Amir Mahdi by breastfeeding him. [RR vol.5, p. 83-84]. Appellant became pregnant again in the summer of 2009 while visiting Iran. Amir was happy to have another child, but Appellant seemed a little frightened or scared to be pregnant. Appellant did not want to have the second child. She wanted to take

medication to abort the pregnancy. Appellant's Aunts, who are doctors in Iran, tried to convince her not to abort, but she persisted and one aunt gave in. One aunt gave Appellant the abortion pill, but then the other aunt gave Modaressi another pill to stop the abortion. This caused complications in the pregnancy and she was put on bed rest in Iran while Amir returned to the United States for his education. Appellant stayed in Iran with her family until the doctor released her to travel home. [RR vol.5, pp. 87-90]. Amir flew to Iran to escort his wife back to U.S. During the flight, Appellant sat in first class while he was in common class. Appellant began to have an episode so a flight attendant came to get Amir. [RR vol. 5, pp. 91-91]. Amir found her crying and acting weird. She was kicking and laughing nonstop. She couldn't control her hands and feet. It had been two years since the first episode just after the birth of her first child, Amir. [RR vol. 5. P. 93]. While in Iran, the doctors took Modaressi off of her medication because it would have an effect on the child. The plane landed and an ambulance was brought immediately. She was taken to the hospital where they gave her an injection to calm her nerves. She was in the hospital in Qatar for psychiatric treatment until she eventually returned to normal. So they traveled back to Houston together. [RR vol.5, pp.94-95].

Their second son, Masih Golabbakhsh, the Complainant, was born on January 31, 2010. Appellant was different with Masih. She couldn't breastfeed him. Amir's mother was raising Masih. Appellant mostly slept and laid down. It was like she

was depressed. [RR vol.5, pp. 96-99]. Appellant did not want her father-in-law to be around so they decided that he would stay in Iran to keep Appellant from stressing during or after the delivery. [RR vol.5, p. 100]. After giving birth to Masih, the family went to visit Appellant's brother Robzeh in New Jersey during Spring Break. [RR vol.5, 102]. Amir's father returned home when Masih was two weeks old. Appellant wanted to take her children to visit her family in Iran but Amir would not allow her to go to Iran with the children unless he was with her. Amir was concerned about her episodes and because she was sleeping all day, neglecting her responsibilities. Amir gave her the option to go by herself, but she did not want to go by herself. [RR vol.5, pp. 103-105]. Appellant was still seeing Dr. Janarthanan (hereinafter referred to as Dr. J) at MHMRA. Amir wanted her to show some motivation before she could go to Iran so Appellant started trying to take the baby in her hands, getting out of bed, and cooking. [RR vol.5, pp. 107-108]. Amir had observed that Appellant was much happier when she was in New Jersey with her brother than she was at home. [RR vo.5, pp108]. The doctor evaluated her and said she can travel but Amir disagreed with the doctor. [RR vol.5, p109].

On April 21, 2010, Amir walked to work. Amir has epilepsy so he was advised not to drive. [RR vol.5, p. 111]. When Amir left for work, Appellant was still sleeping. On April 21, 2010, Amir had a presentation to defend his thesis. But he forgot his flash drive at home so he called Appellant to bring it to him. She seemed

fine. She brought the flash drive within 10 or 15 minutes because she walked. [RR vol.5, p114-115]. Around 5:30 or 6pm, Amir received a phone call from his mother panicking saying that something happened to the baby. [RR vol.5, p.117]. When Amir and family arrived at the site where the baby was allegedly kidnapped, Appellant was already in the police car. [RR vol.5, p. 120]. Amir did not have contact with Appellant until he saw her at the NPC (Neuro Psychiatric Center) locked up. It was around 1 or 2am. By that time, they had found the baby's body and Amir was aware of what she had told the police. [RR vol.5, p. 121-122]. After Masih was born, Appellant tried to kill herself by overdosing on her pills. She was taken to the hospital. She denied taking the pills but the pill container was empty so they determined she had overdosed. [RR vol. 5, pp 122-124]. Medical records from Iran showed that Appellant had been treated for bipolar mood disorder by Dr. Hatefi on September 25, 1999. [RR vol. 5, pp 134]. On May 14, 2006, she went back to Dr. Hatefi because she was showing hypomanic symptoms. Amir never knew she was bipolar. He thought she had a thyroid problem and she took medication treat her thyroid problem. Amir didn't find out she suffered from bipolar disorder and postpartum psychosis until after he hired attorney George Parnham, who got her medical records from Iran. [RR vol. 5, pp 136-137]. Amir recalled that after Appellant gave birth to their first son Amir, she suffered from postpartum psychosis and spent 26 to 28 days in Ben Taub Hospital. [RR vol. 5, p. 138]. Modaressi also

experienced ECT. [RR vol. 5, p. 141]. After the episode at the University which occurred after Amir's birth, Dr. Vaughn suggested that if she was not voluntarily admitted by her family, they were going to move for involuntary commitment into Ben Taub because of her condition. [RR vol. 5, pp 150-151]. Appellant was hallucinating and thinking she was receiving messages from people's shoes. [RR vol. 5, p. 152]. She was laughing inappropriately. [RR vol. 5, p. 153]. She was crawling on the carpet and turning around in circles. [RR vol. 5, p. 154]. She was saying that people were out there with negative energy, trying to hurt her with their minds and that the evil eye was also trying to hurt her. [RR vol. 5, p. 155]. During her high risk pregnancy when flying back to the United States, Appellant seemed normal, having organized thoughts and not talking nonsensically. [RR vol. 5, p. 159]. Then suddenly on the flight she became hysterical. It was different from the episode that she had after Amir's birth. [RR vol. 5, p. 160]. For the last 3 or 4 months of the pregnancy, Appellant did not exhibit any bizarre tendencies because she was getting her medication (Depakote). [RR vol. 5, p. 162]. Appellant was put on antipsychotic medication because of her illness. After Masih was born, she was put on Zyprexa. She seemed incapable of bonding with Masih. [RR vol. 5, p. 163]. She could not breastfeed because of the medication. She basically slept all day for two months and had a poor appetite. [RR vol. 5, pp. 164-165]. After the birth of her first child, Appellant almost immediately begins to act from normal to abnormal. [RR vol. 5, p.

168]. She was then put in Ben Taub for psychiatric care for 26 or 28 days. She became an outpatient and would go to the hospital once a month to get her medication. On the trip back from Tehran to the United States, after Appellant was taken off her medication, she had an episode on the airplane. She was then hospitalized. [RR vol. 5, p. 169]. After giving birth to her second child and visiting the doctor at MHMRA, her medication was changed from Depakote to Zyprexa. [RR vol. 5, p. 170]. That is when she went into an abnormal state, sleeping and not caring for Masih and was unable to bond with Complainant Masih. [RR vol. 5, p. 171]. Iranian medical records written by Dr. Salom Al-Manni, Senior Consultant of Psychiatry from Rumailah Hospital show the medications she was given while in Qatar. [RR vol. 5, p. 175]. Medical records from Isfahan show treatment for Appellant in 2001 and 2004 for depression and drop in motivation. [RR vol. 5, pp. 176-177]. Defense Exhibit No. 8 shows treatment and medications of Depakene and Risperdal were given to Appellant since September 25, 1999 for her bipolar disorder due to psychotic symptoms. [RR vol. 5, pp. 179-180]. Appellant gave a 3 ½ hour noncustodial tape recorded statement to Detective Miller Waters. She tearfully discussed divorce and wanting medical help before she agreed to take police to the baby. She wanted to go back to Iran. [RR vol. 7, pp. 9-11, vol. 5, p.192]. Detective Walters described the second statement as custodial and it was taken after they found the baby at 9:50pm. [RR vol. 5, p. 193]. Detective Waters took Appellant to NPC

(Neurological Processing Unit) for an evaluation where they are trained to deal with mental health issues. [RR vol. 7, pp. 16-17]. The next day, Walters took another statement from Appellant to get an explanation for why she placed Masih in the mud alive. [RR vol. 7, pp. 18-19]. Appellant never admitted to Detective Waters that she intended to kill the child. [RR vol. 7, p. 25]. Detective Waters did not know anything about Appellant's mental illness or postpartum issues. [RR vol. 7, pp. 29-30]. Appellant admitted to Waters that she had been in bed for 21 hours before getting up to take her husband his flash drive. [RR vol. 7, p. 32].

Appellant's father in law Amir Golabbakhsh testified that she had an episode after the birth of her first child. He noticed that Appellant was different about eight days after her first child was born. [RR vol. 7, pp. 58-59].

Appellant's mother in law Doris Golabbakhsh testified about some of her observations of Appellant's mental illness. Doris recalled the incident at the university when they asked the security guard to help find Appellant. The security guard told Amir and Doris that Appellant was chasing cars and bumping the back of the cars. [RR vol. 7, p. 109]. Doris saw Appellant shaking and she could not stop moving her hands all around. When they got her home, Appellant was crawling on the floor, she could not stand up. Amir took her to Ben Taub where she stayed for 26 days. Thereafter, Doris would drive Appellant to her monthly appointments at MHMRA. Amir, her son, asked Doris had to take care of Masih because Appellant

could not take care of him. Appellant was sleeping a lot. [RR vol. 7, pp. 113-114]. Doris recalled that Appellant seemed depressed and lethargic, sleeping a lot, and not bonding with the baby. She was unable to care for him. [RR vol. 7, p. 134].

Defense witness Dr. Debra Osterman is a psychiatrist for MHMRA and testified she was asked to visit Appellant since she had experience dealing with patients with postpartum illness. [RR vol. 8, pp. 6, 11]. She treated Appellant from April 23, 2010 in the Harris County Jail until she was released on April 16, 2012. Dr. Osterman diagnosed Appellant with bipolar, a serious mental illness that includes mood disorder where they are both depressive episodes and manic episodes. Bipolar people may sleep almost 24 hours a day or may not be able to sleep at all. Bipolar people sometimes are unable to enjoy anything. With manic episodes, a person is very likely to do things that are very risky or that are very unusual for them that may endanger them or others. [RR vol. 8, pp. 16-18].

Dr. Osterman became aware of Appellant's psychotic/manic episodes with psychotic features. Dr. Osterman described Appellant's first episode in her late teens when she was treated for depression in Iran. [RR vol. 8, p. 18]. The antidepressant flipped her over into a manic episode. The next was after the birth of her first child. Another was about four months into gestation with baby Masih when she was flying home from Iran and she started screaming on the airplane. She was very disorganized with hallucinations -- hearing her uncle and aunt speak to her when they were not

there. These are psychotic and manic symptoms. [RR vol. 8, p. 19]. Dr. Osterman gave definitions of Modaressi's psychotic symptoms. Dr. Osterman defined delusions are where you have the belief that something is true, but it makes no sense to anyone else. A person in psychosis can be very disorganized in one's thinking or potentially be catatonic. Catatonic is where someone is unable to move or being highly agitated and not being able to sit still. [RR vol. 8, p. 20]. Hearing voices is an hallucination. [RR vol. 8, p. 23]. Dr. Osterman testified that Appellant's crawling on the floor before going to Ben Taub is an example of Catatonia, but a clearer example is Appellant's 21-hour sleeping in bed prior to the offense. Typically someone suffers from 2 or 3 of these symptoms (hallucinations, delusions, disorganized thoughts, and catatonia) for one to be considered psychotic. [RR vol. 8, p. 26]. Dr. Osterman testified that the Ben Taub medical records of Modaressi receiving messages from people's shoes is a strong indicator of psychosis. Dr. Osterman diagnosed Modaressi as demonstrating both manic and depressive psychotic symptoms. [RR vol. 8, p. 27]. A person such a Modaressi with bipolar disorder may go into a manic depressive episode after the birth of their first child and are at greater risk of experiencing postpartum illness. Dr. Osterman described postpartum depression as more severe that baby blues because a postpartum manic episode or a postpartum psychosis illness develops within the first two weeks after delivery. Appellant actually appeared to have both the mood episode with the

psychosis. [RR vol. 8, p. 33]. Appellant's depressive symptoms began getting much worse about two weeks prior to Masih's birth. 24-hours after the birth, Modaressi told her husband that Masih should never have been born. [RR vol. 8, p. 37]. Dr. Osterman testified that the depression had been going on since about two weeks prior to Masih's birth to about 13 weeks. Modaressi had a sudden increase in her energy level on the day of the incident. [RR vol. 8, p. 38]. Dr. Osterman testified that if someone is very very depressed and lethargic and then suddenly they get energized by a bit of some manic symptoms and unrealistic thoughts, they may act on the really bad thoughts they've been having. And it may actually be much more dangerous to them and or to anybody in their surroundings. [RR vol. 8, pp. 40-41].

Dr. Vasantha Janarthanan, psychiatrist for MHMRA testified that she began seeing Appellant in March 2007. [RR vol. 8, p. 160-161]. Dr. Janarthanan testified that Modaressi came to MHMRA after a psychiatric hospitalization after a manic psychotic episode. She stayed for three or four weeks. Appellant's history showed that she was becoming hyperactive: irrational, agitated, screaming, yelling, running around, and paranoia. She was paranoid that somebody was going to harm her child and was making elaborate plans. [RR vol. 8, p. 162]. After the birth of her child in 2007, she experienced lots of manic symptoms. She was taking Zyprexa, Depakote, and a small dose of Klonopine. These medications are consistent with the treatment of Bipolar I Disorder. Dr. Janarthanan continued to see Modaressi at MHMRA for

the next three years, about one to three times a month.  [RR vol. 8, pp. 163-166].

Appellant improved for a time but returned to a major depressive state in 2008. She

was not functioning at all at that point. Over the six/seven months to a year, she

improved very slowly. But then she began to slide again. Dr. Janarthanan saw her

regularly except for when she traveled to Iran.   [RR vol. 8, pp. 167-8].  Appellant

was getting psychiatric treatment in Iran. [RR vol. 8, pp. 169]. Bipolar disorder is an

episodic illness, meaning the severity of the illness can fluctuate.  Episodes can be

triggered by environmental factors or by involuntary brain chemistry or changes in

a person's physiology. [RR vol. 8, p. 171].  Appellant experienced another episode

in October 2008. Her medications were adjusted. [RR vol. 8, pp. 172-173].  In early

spring 2009, Appellant went to Iran and returned about 4 months pregnant. While in

Iran, Appellant's medication was stopped as a result of the pregnancy so she had

been off of her medications for four months.  [RR vol. 8, p. 174].  So when the

airplane stopped in Qatar, the doctors treated her with Depakene, a form of

Depakote.  [RR vol. 8, pp. 176].  When she arrived in the US in September 2009,

Dr. J switched her to Zyprexa because the Depakene could be harmful to the fetus.

Two months before the birth of Masih, Dr. J starts to see depressive symptoms. In

January before Masih's birth, Appellant was very depressed, very down again, non-

motivated, no interest, sleeping all the time, would not function at all, even in her

day-today activities. She had no energy. Appellant is so sick, Dr. Janarthanan

changes her medication by adding Prozac to counter the depressive symptoms. When Dr. Janartanan saw D on February 6, 2010, she stopped the Prozac and added Lamictal since the depression was not getting any better. Her depression continued to worsen. [RR vol. 8, pp. 178-184]. Dr. Janarthanan saw Appellant in the first week in January 2010. [RR vol. 9, p. 6]. She was still sad and depressed, lost interest in most activities, lost functioning in terms of taking care of herself and not just the baby. After the baby was born, Dr. Janarthanan saw Appellant on February 16, 2010. Then they had a telephone conversation where Modaressi said her Prozac was not working and her depression had worsened. [RR vol. 9, p. 7]. Dr. J stopped the Prozac with no substitute because she thought maybe taking her off Prozac would help. [RR vol. 9, p. 8]. Dr. J constantly monitored and adjusted Appellant's medication and status. [RR vol. 9, p. 9]. Appellant was worse off in February with increased depression and sadness exacerbated and elevated while having suicidal thoughts. Dr. J started her back on Lamictal 25 milligrams which she had taken before and during another depressive episode. The dosage increased to 50 mg while she was still taking Zyprexa at 10mg. p.10. Dr. J saw Modaressi in mid-March and she was doing a little better. She no longer had the suicidal thinking. [RR vol. 9, p. 11]. All of her abnormal symptoms were still there when Dr. J saw Appellant on April 16, 2010. She was still a long way from normal. Appellant's Lamictal had been increased to 100mg for her bipolar depression. She was only able to stay up for a few hours a day

and she was still very sick four days before Masih's death. [RR vol. 9, pp. 12-13]. Dr. Janarthanan testified that according to medical reports, Modaressi had been in bed for 21 hours the day before April 20, 2010 which is not a good sign. [RR vol. 9, p. 14]. Dr. Janarthanan testified that Modaressi had bipolar illness, which is the depressed mood most of the day nearly every day. Modaressi also suffered from hypersomnia, psychomotor retardation, fatigue/loss of energy every day, feelings of worthlessness/excessive or inappropriate guilt. Appellant had a lot of guilt about not being able to function and take care of her child or of being useful to anyone. Dr. J explained that some of Appellant's symptoms are hidden because of the severity of other symptoms. [RR vol. 9, pp. 16-18]. Dr. J testified that on their April 16, 2010 appointment, Appellant was strongly focused on going back to Iran. She presented with motor retardation, meaning slow speech and lethargic appearance. Motor retardation is a normal symptom of depression. Family conflict was a stressor for Appellant. Her husband was supportive and tried to make her stress level as low as possible. Appellant cooperated with taking her medicines. [RR vol. 9, pp. 20-24]. Dr. J testified that her medical notes shoe that on February 11, 2008, Appellant showed bipolar disorder with psychotic features. The same diagnosis was on February 16, 2010, even though no psychotic features were observed that day. Following the birth of her child, she experienced postpartum psychosis, but was not on medication. She had delusions and hallucinations, which are all the characteristic

elements of psychosis. [RR vol. 9, pp. 28-30]. Dr. J testified that people with bipolar disorder get racing thoughts, irrational thoughts, impulsivity that comes and goes. Sometimes the doctor is unable to capture these psychotic features in one particular visit. Even when people know they are sick, they are capable of hiding things from doctors because they don't like to let other people know that they are messed up in the head. [RR vol. 9, p. 32].

Appellant's brother Rozbeh Modaressi, a research scientist at Columbia University in New York, testified that he and his sister were very close. [RR vol. 9, pp. 36-38]. Appellant was very dependent on Rozbeh. So when he was selected best student to get a scholarship in 1998, he left to study in Belgium. As soon as Rozbeh left Iran for Belgium, Appellant, just 17 years old, got sick and extremely depressed. She had to see a psychiatrist for two years. [RR vol. 9, p. 38-39]. She was treated for depression with shock therapy, PCT. Appellant got married at 23 years old. [RR vol. 9, p. 40]. Appellant was advised against a second pregnancy. [RR vol. 9, p. 42]. Rozbeh learned that her first pregnancy led to her illness and that the severity of her illness increased. He was also unhappy about the second pregnancy because every single doctor told them not to get pregnant. [RR vol. 9, p. 43]. He did not talk about his unhappiness about the second pregnancy, but, instead, he was supportive and visited Houston three times. [RR vol. 9, p. 44]. Rozbeh noticed that in Houston, Appellant was micromanaged by her father-in-law and saw was not happy. He would

micromanage how she washed the dishes. [RR vol. 9, p. 47]. Rozbeh spoke to Appellant about four days before the incident and she was very upset. [RR vol. 9, p. 48]. When Rozbeh saw Appellant in February 2010, she was very sick with no energy and she was sleeping a lot. [RR vol. 9, p. 63].

Defense witness Dr. David Self, a medical doctor and psychiatrist hired by the defense to determine if Appellant was competent to stand trial. [RR vol. 9, p. 69, 85]. Dr. Self testified that he examined Appellant on August 5, 2010, March 11, 2011 and one other time. [RR vol. 9, p. 84]. Dr. Self reviewed the psychiatric evaluations and reports by Harris County Jail Dr. Johnson dated April 22, 2010. [RR vol. 9, p. 85]. Dr. Self reviewed the psychiatric evaluation of Appellant documented by Dr. Ahmed when Appellant was booked into the jail. Dr. Self reviewed the psychiatric evaluation of Appellant by jail Dr. Ostermann. Dr. Self also reviewed the police reports and police audio/video recordings of HPD interview with Appellant on April 21st and 22nd of 2011 (sic). Dr. Self reviewed the reports by Dr. Salem Al-Mannai (four day hospital stay for manic psychosis in Qatar) and Dr. Coverdale at Ben Taub. [RR vol. 9, pp. 85-86]. Dr. Self reviewed Appellant's Jail Psychiatric Service records for treatment from April 23, 2010 to July 23, 2010. Dr. Self reviewed her medical records by Dr. Janarthanan at the MHMRA clinic. [RR vol. 9, p. 87]. Dr. Self's professional opinion was that Appellant suffered from one of the most severe mental illnesses that we know about, Bipolar Disorder Type I in

a depressed phase with psychotic features. He added that Bipolar Type I has a 20-25% suicide rate. [RR vol. 9, pp. 100-101]. Dr. Self told the story of Appellant's psychiatric history from all of the medical records and police investigation reports and recordings. Dr. Self testified Appellant was born in Iran, the youngest of three children. Somewhere around fifteen Appellant started having minor mood changes. When her brother moved to Belgium to work on his doctorate degree, she fell apart. [RR vol. 9, p. 103]. Appellant was seen by a psychiatrist for the first time. She was treated with antidepressants. When you give bipolar patients antidepressants unabated by some mood stabilizer, another medicine, they flip over into mania and that's what she did. [RR vol. 9, p. 103]. Bipolar, in general, is a brain disorder that causes shifts in mood. Grossly abnormal moodiness that anybody seeing them would recognize it. This disease is also known as manic depression. A manic episode can present with a person full of energy, abnormally happy like they are on drugs when they are not. [RR vol. 9, p. 104]. People in mania can be very talkative where they can't stop talking. They easily distracted and change topics in a heartbeat. They stay busy, busy, busy. They start a hundred projects and finish none. They get by on no sleep sometimes for days without fatigue, without the sensation of being tired. [RR vol. 9, p. 105]. Appellant was in this manic state after the birth of her first child, the records from Ben Taub talk about her having been sleeping very little and staying busy, busy, busy, cleaning the house and organizing and doing and going, finishing

nothing, starting a hundred things. [RR vol. 9, p. 106]. She had been experiencing a profound bipolar depression for some time. Just before the birth of baby Masih, depressive symptoms emerged. They got bad right after the birth. She improved slightly but went back to bad. [RR vol. 9, p. 110]. Bipolar I means they have big depressions and big mania, and that's what the defendant has. Appellant experienced hallucinations when on the plane returning to the US. She was hearing an uncle of hers lecturing in Farsi, and she felt that lecture was about her. And she was screaming and running in a very agitated and excited state. They had to take her off the plane and put her in a hospital in Qatar. [RR vol. 9, p. 114]. When she got sick after her first son, she was very ill, hearing voices and displaying bizarre ideations, delusional thinking. The Ben Taub records contained a religious flavor in her delusional thinking. She believed she was a direct descendent of Moses, and as a result, she could understand things that other people couldn't. She believed the Ben Taub doctors were all direct descendants of Jesus. She believed people were putting the evil eye on her and were going to harm her. [RR vol. 9, p. 115]. In Iran she earned an Associate's degree in family health. But college was sometimes interrupted by brief periods of hypomania and depression where she couldn't get out of bed and go to class or running doing a hundred thinks and completing none. [RR vol. 9, p. 116]. Dr. Self described bipolar disease as a degenerative, progressive disease and the more sever it is, the more severe it's going to be in the future. [RR vol. 9, p. 126].

During flight back to US Appellant was crying and screaming and hearing voices. She was hospitalized in Qatar for four days and given antipsychotic and mood stabilizer medication. Then when she arrived back in Houston she started going back to MHMRA where Dr. Janarthanan stopped the meds that she had been put on in Qatar to stabilize her and started her on Zyprexa throughout the rest of her pregnancy until delivery. [RR vol. 9, p. 127]. Zyprexa has potent mood stabilizing properties. It's a great anti-manic but only a fair antidepressant. It's a good antipsychotic. Lamictal is the choice drug for individual suffering from bipolar. Appellant went to MHMRA on January 7, 2010, just prior to Masih's birth. She was seen monthly at MHMRA by Dr. J from September 2009 to April of 2010. After Masih was born, her condition got worse. The MHMRA records reflect she told her husband, it's better he died. I cannot take care of him. She felt incapable of taking care of him and satisfying her life demands. [RR vol. 9, pp. 129-131].

## SUMMARY OF ARGUMENT

The jury erred imposing a life without parole sentence because the sentence is cruel and unusual punishment prohibited by the Eighth Amendment and the Texas Constitution since the jury had no opportunity to consider mitigating evidence, which would justify a less severe sentence. The 14th Amendment should prohibit the life without parole punishment when a mother commits infanticide when suffering from severe mental illness as here, bipolar and postpartum psychosis. There was insufficient evidence to support a conviction for capital murder because Appellant's sick mind told her to hide or get rid of the baby, but never to kill the baby. The motion for new trial should have been granted to allow mitigating testimony of Appellant's good character while in jail and properly medicated for the three years she waited for trial.

## ARGUMENT AND AUTHORITIES

I:    THE TRIAL COURT ERRED BY DENYING APPELLANT'S MOTION TO DECLARE TEXAS PENAL CODE 12.31(a)  and  19.03(a)(8) STATUTES AS UNCONSTITUTIONAL AS CRUEL AND UNUSUAL PUNISHMENT PROHIBITED BY THE EIGHT AMENDMENT OF THE UNITED STATES CONSTITUTION AND Art. 1 § 13 of THE TEXAS CONSTITUTION AS APPLIED TO THIS DEFENDANT WHO WAS SUFFERING FROM MENTAL ILL WHEN INCIDENT OCCURRED.

Appellant asks the question. Does imposition of a life-without-parole sentence on a mentally ill woman convicted of the killing of her own precious baby during a psychotic episode violate the Eighth Amendment and the Texas Constitution against

cruel and unusual punishments by precluding consideration of her mental health or any other mitigating circumstances?  We submit the answer is Yes.

## A. Constitutional Importance of Mitigating Evidence

A judge or jury should not be precluded from considering mitigating facts as an aspect of the defendant's character proffered for the basis of a sentence less than death.  *Eddings v. Oklahoma*, 450 U.S. 1040 (1981); *see also*, *Lockett v. Ohio*, 438 U.S. 586 (1978); *Penry v. Lynaugh*, 492 U.S. 302 (1982); *Smith v. Spisak*, 558 U.S. 139 (2010).  The statute provides a mandatory sentence of life for every capital murder, precluding any consideration of mitigating circumstances.  TEX. PENAL CODE § 12.31(a)(2).  Appellant Modaressi was convicted of capital murder that was undoubtedly occurred due to her mental illness.  However as a consequence of the Texas Penal Code's mandatory preclusion, the jury was prevented from considering her mental illness in commission of the crime and the consideration of the illness during her punishment.  This denial of the consideration of the mitigating illness is categorically cruel and excessive. Because of the statute is categorically cruel and excessiveness towards Appellant Modaressi, a woman who has committed infanticide due to her mental illness and postpartum psychosis, the Texas Life without Parole Statute conflicts with Supreme Court case law and Eighth Amendment principles of Cruel and Unusual Punishment.

**B. Automatic life without parole is categorically excessive, as applied in this case.**

In *Miller v. Alabama*, the U.S. Supreme Court determined that mandatory life-without-parole sentences for juveniles violates the Eight Amendment. *Miller v. Alabama*, 132 S. Ct. 2455 (2012). The *Eighth Amendment's* prohibition of cruel and unusual punishment "guarantees individuals the right not to be subjected to excessive sanctions." *See*, U.S. CONST. amend VIII; *Miller*, 132 S. Ct. 2455, 2463; *Roper v. Simmons*, 543 U.S. 551, 560 (2005). The Texas Constitution provides for a similar interpretation of stating that punishment should not be "cruel or unusual." TEX. CONST. art. 1 § 13. This is a right that "flows from the basic 'precept of justice that punishment for crime should be graduated and proportioned'" to both the offender and the offense. *Miller*, 132 S. Ct. 2455, 2463.

"'A capital sentence is cruel and unusual under the Eighth Amendment if it is imposed without an individualized determination that that punishment is 'appropriate' -- whether or not the sentence is 'grossly disproportionate.'" *Harmelin v. Michigan*, 501 U.S. 957 (1991); *Woodson v. North Carolina*, 428 U.S. 280 (1976); *Lockett v. Ohio*, 438 U.S. 586 (1978); *Eddings v. Oklahoma*, 450 U.S. 1040 (1981); *Hitchcock v. Dugger*, 481 U.S. 393, (1987). *Miller* and *Wilkerson* draw categorical distinctions, during sentencing, based on diminished culpability and prospects for reform, and those with the diminished culpability and the prospect of reform deserve less severe punishments. *Miller*, 132 S. Ct. 2455, 2463; *Wilkerson v. State*, 347

S.W.3d 720 (Tex. App. – Houston [14th Dist.] 2011, *pet. ref'd*).  Subsequently, when considering the punishment for capital cases involving categorically distinct individuals, the court should view the concepts "according to the evolving standards of decency that mark the progress of a maturing society." *Miller*, 132 S. Ct. 2455, 2463.

Like the *Miller* case, a punishment of automatic life without parole afflicted on the severely mentally ill proves to be inconsistent the Eighth Amendment values because the mentally ill are not culpable enough to warrant these sentences. *Id.* at 2464.  Specifically, women like Appellant Modaressi, suffering from Bipolar Disorder I and Postpartum Psychosis are not culpable enough to warrant such a severe punishment, especially when Appellant was not shown to have anticipated her crime, let alone intended that her child be killed.  Mental illness and postpartum psychosis gives women suffering from mental illness and postpartum psychosis a categorical distinction from other culpable adult-defendants, just as juveniles "'lack [maturity] and an underdeveloped sense of responsibility,'" leading to recklessness, impulsivity, and heedless risk-taking." *Id*.  When Modaressi deteriorated into a psychotic break-down after her first son was born, she had no sense of responsibility evidenced by her leaving him with her in-laws when she was found at her husband's job running in the middle of the street. Just the same after the birth of the second child, Modaressi showed her "heedless risk-taking" behavior when she left the house

with her child and without a chaperon, per the instructions of her husband. She also demonstrated a lack of mental maturity and responsibility when she left her child buried face down in the mud in the woods. Modaressi admits to not intending to kill the child when she buried him which, again, manifests her reckless, impulsive, and heedless risk taking behavior. Modaressi's illnesses indisputably show a "'lack of maturity and an underdeveloped sense of responsibility,'" leading to recklessness, impulsivity, and heedless risk-taking."

Also, global societal values provide a basis for a categorical line between those who suffer from severe mental disorders and other adult offenders. Most science also provides a stark contrast and categorical distinction between those who suffer from severe mental disorders and other adult offenders:

> Advances in neuroscience have dramatically increased the understanding of how the brain function is altered by mental illness, and how psychotic illness can distort reality….A failure to appreciate the impact of mental illness on thought and behavior often lies behind decision to convict and punish persons with mental disorders…(APA Statement of the Insanity Defense and Mental Illness. Release No. 02-08, Washington, DC, APA, March 2002).

During the months after her second child's birth, Modaressi was experiencing both mental illness and psychotic illness which would give rise to a distorted reality. Modaressi's failure to realize that burying her child in the woods for hours would result in the child's death is a clear distortion of reality, and the Texas Statutes failure

to appreciate the impact that Modaressi's mental illness and psychotic illness on her thoughts and behaviors have resulted in her conviction and punishment at life in prison without the possibility of parole.

In addition, these sentences are inconsistent with valid penological goals because they also fail to appreciate two major delineations: 1) deterrence or retribution and 2) cruel and/or unusual punishment. These sentences neither deter for the 4% of women who would commit the same crime because of their mental illness nor provide retribution for the families and friends suffering. *Miller*, 132 S. Ct. 2455, 2464. "'Retribution and deterrence of capital crimes by prospective offenders" as the social purposes served by the death penalty. Unless the imposition of the death penalty on a mentally retarded person "measurably contributes to one or both of these goals, it 'is nothing more than the purposeless and needless imposition of pain and suffering,' and hence an unconstitutional punishment.'" *Atkins v. Virginia*, 536 U.S. 304, 319 (2002). Appellant Modaressi is a part of this class of women suffering from Bipolar Disorder I and postpartum psychosis who have committed infanticide. Because of the distorted reality of Appellant Modaressi and women suffering from these illnesses, these women have the proclivity to commit infanticide regardless of the sentence of another, and thus the sentence does not deter others, much less prevent sick mothers like Modaressi, from killing their children in the future. Neither does the severe punishment of Modaressi provide

retribution for her own family who is suffering from the loss of two family members – Appellant and the baby.

These punishment schemes are inconsistent with contemporary values, and the implications of the contrary are astonishing. One cannot wholly disregard the unstable mental health of a woman suffering from Bipolar Disorder I and Postpartum Psychosis plays a vital role in her thought process. Because automatic life without parole is categorically excessive or "grossly disproportionate" to Appellant, a woman suffering from these illness, this punishment scheme is inconsistent with Eighth Amendment principles of cruel and unusual punishment. This scheme also proves to be inconsistent with "evolving standards of decency." Therefore, the statute proves unconstitutional according to both federal and state provisions, as applied.

II.    THE TRIAL COURT ERRED BY DENYING APPELLANT'S MOTION TO DECLARE TEXAS PENAL CODE 12.31(a) and 19.03(a)(8) STATUTES AS UNCONSTITUTIONAL BECAUSE LIFE WITHOUT PAROLE SENTENCE ON A MENTALLY IS WOMAN CONVITED OF INFANTICIDAL HOMICIDE VIOLATES THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND Art. 1 §§ 3, 13 of THE TEXAS CONSTITUTION WHICH PROHIBITS UNFAIRLY TARGETING AN ENTIRE CLASS OF PEOPLE—women with mental illness exacerbated by postpartum depression.

The automatic life without parole sentence is prohibited by the 14th Amendment since the statute unfairly targets a class of women who commit

infanticide. The Texas Penal Code §12.31(a) is unconstitutional under the 14th Amendment as applied in this case. The statute unfairly targets a class of women who commit infanticide when affected by Bipolar Disorder I and postpartum psychosis because it mandates a sentence of life without parole. Women who commit infanticide will always be found guilty of the capital murder and, thus, mandatorily subjected to an automatic sentence of life without the possibility of parole. The same women will not be afforded their fundamental right to equal protection under the law even though there are mitigating factors that contributed to their killing their own children and that explain their mental state, which should demand a more lenient punishment. Or, in the alternative, a less severe punishment to fit the crime—like being sentenced to a mental health facility because they are truly insane to kill their babies.

This particular class of women are not similarly situated because they are not provided the same laws as other adult defendants who are allowed to present mitigating evidence during trial, especially when their mental illness plays an extraordinary role in the commission of the crime.

The Fourteen Amendment demands that "all persons similarly situated shall be treated alike" under the Equal Protection Clause. U.S. CONST. amend XIV; Plyler v. Doe, 457 U.S. 202 (1982); Wood v. State, 18 S.W.3d 642, 651 (Tex. Crim. App. 2000); *State v. Rosseau*, 396 S.W.3d 550, 557 (Tex. Crim. App. 2013). The Equal

Protection Clause was not intended to demand equal enforcement of the law but rather that the law itself be equal. Jospeh Tussman and Jacobus tenBroek, *The Equal Protection of the Laws*, 37 Cal. L. Rev. 341 (1949), available at: http://scholarship.law.berkeley.edu/californialawreview/vol37/iss3/1." The equal protection of the laws is a pledge of the protection of *equal* laws." *Yick Wo v. Hopkins*, 118 U. S. 386, 369 (1886). (*emphasis* added).

If the state has no sufficiently "important" reason for treating similarly situated people differently, the state violates the Equal Protection Clause. *See, e.g., Tennessee v. Lane*, 541 U.S. 509, 522 (2004) (citing *City of Cleburne v. Cleburne Living Center, Inc*., 473 U.S. 532, 439 (1985)); *Plyler v. Doe*, 457 U.S. 202, 248 (1982).

To be "'similarly situated,' groups need not be identical in makeup, they need only share commonalities that merit similar treatment." *Betts v. McCaughtry*, 827 F. Supp. 1400, 1405 (W.D. Wis. 1993). People are "similarly situated if their circumstances are comparable in all material respects, including similar standards…" *Grice v. Alamo Cmty. College Dist*., 2013 Tex. App. LEXIS 4999, 118 Fair Empl. Prac. Cas. (BNA) 354 (Tex. App.—San Antonio Apr. 24, 2013). In this regard, the statutes do not give the same material respects to all defendants because they do not allow mitigating evidence to be presented for all defendants. The state also neglected to proffer a sufficiently "important" legal reason for not

allowing mitigating evidence when prosecuting adult-defendants with mental illness and postpartum psychosis. Even Appellant Modaressi was not afforded the consideration of mitigating evidence as other adult-defendants would receive if the charge were murder instead of capital murder (non-death).

This class of women have slipped through the cracks of human decency because society as a whole does not understand mental illnesses such as Bipolar Disorder I coupled with postpartum psychosis bipolar. This class of women are unprotected. They are grouped together like the average capital murder defendant, but should not be due to their involuntary illnesses. And they are not currently receiving the same protections as other classes; therefore, the statue violates the Equal Protection Clause of the 14th Amendment and should be declared unconstitutional as applied to this case.

III: THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT CONVICTION FOR CAPITAL MURDER.

Appellant did not intend to kill her baby. The evidence did not support that Appellant formed the intent to kill Complainant but only that she was suffering from severe mental illness and hallucinations that told her to get rid of it.

*Jackson v. Virginia, 443 U.S. 307 (1979)*, as the standard for reviewing the sufficiency of evidence." In determining whether the evidence is legally sufficient to support a conviction, a reviewing court must consider all of the evidence in the

light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational fact finder could have found the essential elements of the crime beyond a reasonable doubt." *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011)."In determining whether the evidence is legally sufficient to support a conviction, a reviewing court must consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational fact finder could have found the essential elements of the crime beyond a reasonable doubt." *Gear v. State,* 340 S.W.3d 743, 746 (Tex. Crim. App. 2011). "Capital murder is a result-of-conduct offense; the crime is defined in terms of one's objective to produce, or a substantial certainty of producing, a specified result, i.e. the death of the named decedent." *Robles v. State,* 273 S.W.3d 322, 329 (Tex. Crim. App. 2008). The pertinent question, therefore, is whether the jury could have rationally determined beyond a reasonable doubt from the totality of the circumstantial evidence viewed in a light most favorable to its verdict that appellant had intent to cause the death of the child. *See Jackson, 443 U.S. at 318; Brooks v. State, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010).*

Viewing the evidence in a light most favorable to the jury's verdict, the record reflects that Appellant was suffering from severe mental illness. Hallucinations told Appellant to get rid of the baby. No evidence, however, shows that Appellant knew

that if she hid the baby in the mud, that she intended to kill the baby. Based on this evidence coupled with her severe mental illness, the jury could not have reasonably inferred that Appellant intended to cause the death of her baby.

## IV. THE TRIAL COURT ERRED BY DENYING THE DEFENDANT'S MOTION FOR NEW TRIAL.

This Court must review a trial judge's denial of a motion for new trial under an abuse of discretion standard. This Court must decide whether the trial court's decision was arbitrary or unreasonable. A trial judge abuses his discretion in denying a motion for new trial when no reasonable view of the record could support his ruling. *Holden v. State,* 201 S.W.3d 761, 763 (Tex.Crim.App.2006). Appellant filed a Motion for New Trial and a hearing was conducted to ask for a new trial to offer mitigating testimony of Appellant's good character while housed in the Harris County Jail for three years awaiting trial. Harris County Jail Chaplain Cynthia Corder testified that Appellant was a model inmate with good moral character. Chaplain Corder also testified that Appellant converted the Christianity while in jail.

The trial court abused her discretion by not allowing the mitigating evidence at trial to support a less severe punishment than life without parole.

## PRAYER

FOR THESE MANY REASONS, the Appellant respectfully prays that this Honorable Court find the Life without Parole Statute in non-death capital cases as unconstitutional in cases where the Appellant is suffering from severe mental illness and commits the crime of infanticide. Appellant prays for a reversal to allow the jury to consider mitigating evidence.

*Respectfully Submitted*,
/s/ Vivian R. King
**VIVIAN R. KING , Appointed Attorney**
SBN: 00784399
2202 Alabama Street
Houston, TX 77004
(713) 222-2019 Telephone
(877) 753-6706 eFax

## CERTIFICATE OF COMPLIANCE

Pursuant to **Tex. R. App. Pro. R. 9.4(i)(3)**, I certify that this document this contains 9718 words according to the word-count function of Microsoft Word 2013. The body text is in 14 point font.

/s/ Vivian R. King

## CERTIFICATE OF SERVICE

Pursuant to **Tex. R. App. Pro. R. 9.5(a) & (e)**, I certify that on April 2, 2015, I electronically filed a copy of the foregoing Appellant's Brief with the Clerk of the Fourteenth Court of Appeals online, with an electronic copy designated for the Honorable District Attorney for Harris County. In addition, I will mail a certified copy to Appellant, Narjes Modaressi on Thursday April 2, 2015.

/s/ Vivian R. King